UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

ARBEN MUSTAFA,

                            Plaintiff,

        -against-

HALKIN TOOL, LTD.,

                           Defendant.

CV-00-4851 (DGT)

**NOTICE OF MOTION**

-----------------------------------------------------------------X

HALKIN TOOL, LTD.

        Third-Party Plaintiff,

        -against-

ELIOU STEEL FABRICATION, INC.,

        Third-Party Defendant.

-----------------------------------------------------------------X

        PLEASE TAKE NOTICE, that upon the annexed Affidavit of Isaac Szpilzinger,

Esq., sworn to on February 27, 2006, with exhibits, including the affidavit of William B. Eaton,

P.E., sworn on February 9, 2006, an accompanying Memorandum of Law and a Rule 56.1

Statement of Material Facts, defendant/third party plaintiff Halkin Tool, Ltd. shall move this

Court for summary judgment, dismissing the complaint, pursuant to Rule 56, F.R. Civ. P.

        Oral argument will be on a date and at a time to be designated by the Court.

        PLEASE TAKE FURTHER NOTICE that pursuant to the Court approved

schedule, Opposition must be served by April 11, 2006 and a Reply by May 2, 2006.

Dated: New York, New York
      February 27, 2006

                                   Respectfully submitted,

                                   HERZFELD & RUBIN, P.C.
                                   Attorneys for Defendant/Third Party Plaintiff
                                   Halkin Tool, Ltd

                                   By:                         
                                            Isaac Szpilzinger (IS-1844)
                                   40 Wall Street
                                   New York, New York 10005
                                   (212) 471-8500

To:      Rheingold, Valet, Rheingold
          Shkolnik & McCartney, LLP
          Attorneys for Plaintiff
          113 East 37th Street
          New York, New York 10016
          (212) 684-1880

          O'Connor, Redd, Gollihue & Sklarin, LLP
          Attorneys for Third-Party Defendant
          Eliou Steel Fabrication, Inc.
          200 Mamaroneck Avenue
          White Plains, New York 10601
          (914) 686-1700

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
ARBEN MUSTAFA,

                     Plaintiff,

     -against-

HALKIN TOOL, LTD.,

                    Defendant.
-------------------------------------------------------------------X
HALKIN TOOL, LTD.

         Third-Party Plaintiff,

     -against-

ELIOU STEEL FABRICATION, INC.,

         Third-Party Defendant.
-------------------------------------------------------------------X

CV-00-4851 (DGT)

**AFFIDAVIT IN
SUPPORT OF
MOTION**

STATE OF NEW YORK    )
                      ss:
COUNTY OF NEW YORK  )

       Isaac Szpilzinger, being duly sworn deposes and says:

       1.     I am a member of the law firm of Herzfeld & Rubin, P.C., attorneys for defendant/third party plaintiff Halkin Tool, Ltd. (HALKIN) in this action. I am fully familiar with the facts and circumstances set forth herein. I make this affidavit in support of HALKIN's motion for summary judgment, dismissing the complaint pursuant to F.R. Civ. P., Rule 56.

       2.     This is a product liability action arising out of a workplace accident on June 3, 1998 at Eliou Steel Fabrication Inc. (ELIOU). Plaintiff, Arben Mustafa, an employee of ELIOU was operating an "Accurpress" Model 725012 press brake (an industrial machine which

1

bends metal), manufactured by HALKIN, when he sustained injuries to both of his arms below the elbows.

3.      Plaintiff sued HALKIN, a Canadian corporation, in New York State Supreme Court Kings County, claiming that the press brake was defective. The action was removed to this Court (diversity jurisdiction). HALKIN then served its Answer and subsequently impleaded ELIOU under F.R.Civ.P. Rule 14 for contribution/indemnity, based upon its culpable conduct. Copies of the Verified Complaint and Answer are annexed hereto as Exhibit A.

4.      The Verified Complaint alleges, in relevant part, that while plaintiff was feeding sheet metal into the press brake machine, the press activated and closed on both of his arms (Exhibit A, Verified Complaint ¶ 6). Three causes of action are asserted as follows: First - Negligence; Second - Strict Products Liability; and Third - Breach of Warranty, claiming defects in the press brake "including but not limited to"

   (a)   the hand activation buttons were overridden by a foot pedal activation device defeating their purpose and safety benefit;
   (b)   failure to provide a necessary safety device;
   (c)   failure to warn potential users about the machine's dangerous propensities (Exhibit A, Verified Complaint ¶ 7).

5.      In its Answer, HALKIN asserted the affirmative defense of statute of limitations with respect to the Breach of Warranty claim.[1]

6.      During the fact discovery phase of the action the parties exchanged documents and materials. In relevant part, the Rule 26 Initial Disclosure provided by HALKIN and ELIOU include the Instruction Manual and the documents related to the sale and purchase of the press brake, which was ordered in September 1990 by ELIOU, through Walsh Atkinson Co. Ltd., a machinery dealer in Hicksville, New York. Annexed hereto as Exhibit B is a copy of

---

[1] By letter to the Court dated November 23, 2005 counsel for plaintiff conceded that the breach of warranty cause of action is time barred (ECF Document 69).

2

HALKIN's Rule 26 Initial Disclosure, with selected attachments. Annexed hereto as <u>Exhibit C</u> is a copy of ELIOU's Rule 26 Initial Disclosure, with selected attachments.

7.      The parties inspected and photographed the press brake at ELIOU and exchanged all photos, which were subsequently marked as exhibits during depositions. Copies of nine relevant photographs are annexed hereto as <u>Exhibit D</u>. Also included in Exhibit D is a VHS video of an inspection of the press brake which was conducted on 12/7/01. Mr. Mustafa was at the inspection and appears in the video. He viewed the video during his deposition and it was marked as "Exhibit N" (Mustafa deposition p237-240).

8.      Depositions of the parties were conducted. References herein to the pages in the transcript of plaintiff Arben Mustafa's deposition shall be by the letter "M" (for Mustafa) and to HALKIN's deposition (Dean Albrecht) by the letter "A" (for Albrecht). Five witnesses from ELIOU were deposed. References herein to ELIOU witnesses deposition testimony will be as follows: Andrew Scopeolitis - "AS"; Peter Eliou - "PE"; Andonis (Anthony) Eliou - "AE"; and Fred Bezler - "FB." Copies of the deposition transcripts of the foregoing witnesses are annexed hereto.

9.      During the expert discovery phase, plaintiff and HALKIN exchanged the reports of their experts, Neal Growney for plaintiff and William Eaton for HALKIN, and depositions of the experts were conducted. References herein to the pages in the transcript of Neal Growney's deposition shall be by the letter "G." A copy of Mr. Growney's report is annexed hereto as <u>Exhibit F</u>. An affidavit by Mr. Eaton, incorporating his report is annexed hereto as <u>Exhibit G</u>. A copy of Mr. Growney's deposition transcript is annexed hereto.

Relevant Factual background

<u>a.</u>      Plaintiff Arben Mustafa's prior employment in metal working

10.      Arben Mustafa, who testified through an Albanian translator, was born in Tirana, Albania on June 29, 1956 (M7) and came to live in the United States on October 21, 1996 (M9). Mr. Mustafa completed High School in Albania in 1975 (M16). He became involved in metal working in 1970 (M24) when he was fourteen years old (M18) and still a student.

11.      In 1972 Mr. Mustafa began a 21 year period of employment (M25) at a metal forming factory [Uzina] in Albania (M33). He started as a machinist (M25) and became a manager fourteen years later, in 1986 (M34). As a machinist Mr. Mustafa operated various metal working machinery, including lathes (M28), milling machines (M31-32) and drilling machines (M32).

12.      During the 14 year period as a machinist Mr. Mustafa became familiar with the hazards associated with machine operation, particularly the hazard of coming into contact with moving machinery (M37) or moving work pieces in the machinery, both from written sources and from personal experience (M38, 40, 41, 42). Mr. Mustafa testified that the general hazard was not to put a hand into the area in a machine where the operation was taking place (M41). The machinery at Uzina had decals containing written hazard warnings (in Albanian) and hazard pictorials (M46). Reading the machine manuals was mandatory at Uzina (M45). By the time he became a manager in 1986, Mr. Mustafa knew full well that he should keep any part of his body away from any part of a machine that might be moving (M46).

13.      Mr. Mustafa was also involved in repairing machinery at the Uzina factory (M48). He testified that when he needed to make a repair on a machine operated by electricity he

4

first had to make sure that the machine was turned off before putting his hand in it (M50). He also testified that if he were going to put his hand into a machine for any purpose, he would first have to make sure the machine was off before doing so (M50).

14.     As manager, starting in 1986, Mr. Mustafa was in charge of all the machinery and employees in one part of the Uzina factory (M33-34), a total of 90 machines (M34), and 120 to 130 employees (M35). He was a manager at Uzina for seven years, until 1993, when the work "ended" (M51).

15.     After coming to the United States in 1996 Mr. Mustafa worked as a machinist in a machine shop repairing broken machine parts (M 53, 54, 56); as a lathe operator (M58); and as a machine mechanic for envelope machinery (M60), before coming to work for ELIOU on June 1, 1998 (M69).

b.     Eliou Steel Fabrication, Inc. history and purchase of Accurpress 725012 press brake

16.     ELIOU was founded in 1970 by Peter Eliou (PE 66-67), who was born in Greece in 1941 (PE56), and came to the United States in 1967 (PE 65), as an experienced iron worker. Peter Eliou initially purchased "small" metal working machinery for his company, which assembled and welded pre-cut and pre-bent steel (PE 69). In 1971 he purchased a used press brake which was operated solely by a foot pedal (PE 71), and other used, larger size metal forming machinery, including a shear (for cutting metal) and punch presses (PE 68-70). In or about 1971 Peter Eliou's brother, Andonis (Anthony) Eliou, also an experienced steel worker (PE 84), came to the United States from Greece and went to work for ELIOU (PE78), which fabricated metal gates, windows, doors and stairways (AE 20-21). In 1974 ELIOU added two employees and continued to grow (PE79). In 1978-79 Andrew Scopelitis (Peter Eliou's brother in

5

law) joined ELIOU (PE80) and subsequently became an officer of the company (PE81). By June 1, 1998 ELIOU had 25 to 30 employees (AS 16).

17.    Anthony Eliou, exclusively, operated the old (used) press brake (AE 30) which was used primarily to bend quarter inch thick steel for stairs (AE 30). In essence, a flat piece of steel was inserted and positioned in the bed of the press brake and the operator stepped on the pedal causing a "knife" (ram) to descend upon it, bend it and go back up (AE 29). The bending process did not require the operator to put his hand very close to the "point of operation," the point where the "knife" (ram) came into contact with the metal to be bent, at any time (AE 28-29).

18.    ELIOU never utilized any maintenance company for repairs to its machinery. It did its own maintenance work and had a machine shop where parts, if needed, were made (PE 74, 75, 85).

19.    In or about 1989 Peter Eliou (and Andrew Scopelitis) felt that the company needed to replace the old press brake with an up-to-date, new machine (PE 87). On occasion, salesmen for a variety of machinery dealers stopped by at ELIOU, and in 1989 Peter Eliou met with one of them, at ELIOU, regarding a new press brake (PE 88-89).

20.    The salesman had catalogs and showed Peter Eliou different machines (PE 90). Peter Eliou testified that the salesperson showed him papers which included an "Accurpress 725012" photograph and a document entitled "Optional" (PE 91 and Exhibit C herein). The salesman went through the items listed in the "Optional" document with respect to the Accurpress 725012 and told Peter Eliou what each option was (PE 91, 93). The 14 options listed on the "Optional" page include "Support Arms for Front Gauging", "Palm Buttons Mounted on Ram" and "Safety Light Curtain". Peter Eliou decided to buy the Accurpress 725012

6

(PE 92) and the options he wanted to buy with it (PE 93-94). The options Peter Eliou selected

were: Power Operated Backgauge, Power Eccentric, High Speed Option and Tonnage Control

(Exhibit B, Press Order; Exhibit C, Quotation # 904271; PE 94). Finally, Peter Eliou signed the

Terms and Conditions sheet for the sale (Exhibit C-Terms and Conditions; PE 92-93). The last

provision on the Terms and Conditions sheet dated 9/13/90 is entitled GUARDING, and states

that:

> OSHA's Safety code states that it is the responsibility of the
> Employer to provide and ensure the usage of "point of
> operation guards" or properly applied and adjusted point of
> operation devices on every operation performed on all
> machines.

> The serial number of the Accurpress 725012 press brake purchased by

ELIOU is 1710 (Exhibit B).

c.     The Accurpress 725012 press brake

       21.    The Accurpress 725012 is hydraulically powered with a capacity of 250

tons and has a 20 horsepower motor. It weighs about 31, 000 lbs. The length of its bed is about

12 feet (Exhibit C, Quotation). It can bend up to one fourth inch thick steel. The controls for

operating the press brake's ram are in a "Remote Operator's Control Station" (hereinafter the

Control Station) which contains electrical controls for operation (Exhibit C-Instruction Manual

pD-1 and associated figure on the following page). The referenced figure notes that due to

varying combinations of options the locations of controls may change from what is shown.

Annexed hereto as Exhibit E is a figure of the Control Station provided with the subject press.[2]

       22.    As indicated in Exhibit E, the photos in Exhibit D and described in Exhibit

C p D-1 and D-2, the Control Station controls include a "stop" button on top of the Control

---

[2] This page is from the Instruction Manual provided by Halkin in its Initial Disclosure.

Station; a Hand/Foot Selector Switch (key operated); Dual Palm Buttons; and a 3-Position Foot

Switch. When the Hand/Foot Selector Switch is in the "Hand" mode, the Palm Buttons operate

the ram. In the "Hand" mode, both of the operator's hands must be simultaneously on the Palm

Buttons. When the Hand/Foot Selector Switch is in the "Foot" mode the Foot Switch operates the

ram. In the "Foot" mode the operator's hands are free. The Control Station is movable (A75) and

there is a handle at its top. It is connected to the press by a cord (AE39).

23.     HALKIN followed ANSI[3] standards, in particular ANSI B-11.3, for the

design of the press brake (A 63, 67). The ability to move the control station a safe distance from

the press is a design characteristic that provides safety when the "Foot" mode is used (A87-88) in

accordance with OSHA[4] (A 90-91). Additional "safeguards" for the press brake are light curtain

(optional) (A 70); palm buttons on the ram (optional); the standard palm buttons on the Control

Station; the stop switch (button) on the Control Station (A139); and the safety features built into

the foot switch (the toe flap and kick plate) (A140). The toe flap must be lifted by the operator's

toe. Once the toe is under the flap, the toe must move forward and make contact with the kick

plate before the toe switch (pedal) will operate, causing the ram to cycle (A 163-164); (see

photos in Exhibit D). The design of the subject press brake complied with all standards

applicable to it at the time of manufacture (see affidavit of William B. Eaton, Exhibit G, p. 6, 13,

16).

24.     In relevant part, three warning decals, two triangular yellow and black

pictorial and one rectangular, written, were placed on the front of the press brake at the time of

manufacture, as shown in the photos in Exhibit D (A 141-142). The written warning states,

among other things, as follows:

---

[3] American National Standards Institute.
[4] Occupational Safety and Health Administration.

"NEVER place any part of your body within the die Area."

<u>d.</u>     Use of the Accurpress press brake at ELIOU

25.     ELIOU bought the Accurpress 725012 to manufacture stairs (AS 88). It had more power and did a better job of bending than the old press brake (AE 36). From the time it was delivered to ELIOU in 1990, Anthony Eliou operated the press brake for seven years without a problem (AE 44).[5] He never operated the press brake using the "Hand" mode (AE 44). Anthony Eliou moved the control station as needed when he operated the press brake (AE 39-41). Depending on the size of the metal to be bent, Anthony Eliou positioned the Control Station approximately one to three feet from the press (AE 46). There was no rule at ELIOU as to where the Control Station had to be placed (AE 66). The piece of metal inserted into the bed of the press brake for bending rested on a flat surface and did not have to be held in place by the operator's hands during the bending process (AE 46). The place where the bend was to be made was pre-set (AE 46, 85, 86) using the power operated backgauge (FB 41-42; 195-198). After bending a piece of metal Anthony Eliou removed his foot from inside the pedal housing, picked up the piece that had been bent, took it to the side and went to get the next piece to be bent (AE 48-49).

26.     Aside from bending metal for stairs, metal for "concrete forms" was bent at ELIOU (AE 49). Metal for concrete forms, referred to as "small pieces" by Anthony Eliou (AE49), could start out being about eight inches wide and four to five feet long and be bent in the center, (at 4 inches) along the length like an "L". The bending process for concrete forms was the same as for stairs. There was no reason for the press operator to have his hands near the point of

---

[5] Anthony Eliou retired about a year before the plaintiffs' accident (AE60).

9

operation (AE 49-50). Parenthetically, Anthony Eliou built an extension frame for the press brake to provide added resting space for metal to be bent (AE47, 84-85).

      27.     Anthony Eliou never requested that a guard be put on the Accurpress 725012 because it was not needed and would interfere with the operator's vision of the job to be done (AE 51-52). He also testified that based upon his experience with the Accurpress 725012, the hand buttons were unnecessary (AE 80-81).

      28.     Fred Bezler, dob 1-28-46 a steel worker since 1964 (FB 7-8), started working at ELIOU in 1994 (FB22). Bezler testified that an advantage to operating the press brake in the "Foot" mode is that once the ram starts bending the metal the operator can hold the front of the metal while the ram ascends (FB 31-32; 34-35). Because of the machine's frontstop and the backstop the operator's hands never had to come near the point of operation (FB 106-107).

      29.     The VHS video in Exhibit D shows the operation of the press brake.

<u>e.</u>     Arben Mustafa's hiring and employment at ELIOU

      30.     Two or three days before June 1, 1998 Mr. Mustafa went to ELIOU for an interview (M72). At that time Mr. Mustafa did not understand English (M73). In the office at ELIOU Mr. Mustafa saw a blueprint of a piece of metal stair and told his translator (M79) "I understand it and I know how to do this" (M75). Mr. Mustafa believes that he also mentioned his previous experience operating machinery (M78). He was hired and told to report for work on June 1, 1998 (M86).

      31.     At ELIOU Mr. Mustafa was taught how to operate the press brake by Frederick Bezler (M 91-92). On June 1 or June 2, 1998 Mr. Mustafa watched Frederick Bezler operate the press brake (M 105, 107, 118). After watching Bezler operate the press brake, Mr.

Mustafa understood how to do it (M92). Bezler operated the press brake by using the foot switch (M123) and Mr. Mustafa operated the press himself using the foot switch (M124).

32.    Bezler testified that he trained Mr. Mustafa on how to work the press brake (FB 79). In "Foot" mode "You have to stick your foot into the pedal all the way, step down on it. It makes a cycle. Now, to make another cycle, you have to take your foot off the pedal. You can't just keep your foot on the pedal because the machine won't work again. You have to take your foot out and then put your foot back in" (FB 131-132; 213). Bezler taught Mr. Mustafa to take his foot out after each cycle (FB 133).

33.    Bezler testified that pushing down the red button on the control station would stop the press and prevent the ram from coming down, even if the operator's foot was on the pedal (FB 194). Bezler further testified that he showed Mr. Mustafa the operation of the red button on the control station (FB 194).

34.    Mr. Mustafa testified that after seeing the die (ram) came down, he knew that if his hand was in there (the point of operation) it could come down on his hand (M126). He further testified that he knew from all of his previous experience that his hand should not be in the area where the die (ram) comes down (M 126). Mr. Mustafa testified that he did not recall seeing the yellow and black triangle pictorial decal on the press and that he had not paid attention to it (M 126, 197). He also testified that he never left his hand "around the machine" (M219) and that on June 2, 1998 he was aware of the hazard that happened to him the next day (M327).

35.    On June 1 or June 2, 1998, Mr. Mustafa knew that the Control Station could be moved (M131, 160). Mr. Mustafa testified that he saw Mr. Bezler move it (M 132, 162-163). On June 1, or June 2, 1998 Mr. Mustafa bent 35 or 40 steps (M 135). Each step started out flat and was bent three or four times (M 166-167) resulting in over one hundred fifty pedal

activations and ram descents (M315-316). When Mr. Mustafa put his foot on the pedal, he watched the ram come down (M 179). He testified that after each bend was done, he took his foot off and out of the pedal, as he saw Bezler do it (M 193; 319; 328). Mr. Mustafa testified that after he completed the bending of a stair he walked with the finished product to put it down, requiring his foot to be removed from the pedal (M220).

36.    When Mr. Mustafa inserted the metal to be bent into the press brake he did not have to come close to the point of operation (M 197). No part of any task Mr. Mustafa was doing on the press brake required him to put his hands in the point of operation (M 198). On June 1 or June 2, 1998 the key for the hand/foot selector switch was in the switch on the Control Station (M 198-199).

f.    The day of the accident

37.    On the morning of June 3, 1998 Mr. Mustafa continued bending the steps he had been working on previously (M 202, 205). While doing this bending there was a directive to change the work (M 207) and Bezler made the necessary adjustment to the press brake (M210, 211). The new metal to be bent was flat, about four or five feet long, and about five or six inches wide. The bend was to be in the middle of the five to six inch width (M 213¬214). Bezler bent two or three pieces while Mr. Mustafa watched (M219). After each piece was bent, Bezler removed it and walked it over to where it was placed (M220).

38.    The accident occurred on the first of these pieces (concrete pour stops) that Mr. Mustafa did himself. He provided the following narrative testimony:

> The one that was not normal was that the metal was
> stuck with the ram that goes down. This made me a little bit
> confused. I put my hands up to pick up the piece from the ram
> and at the time that I touched the metal it was from the weight
> of the metal or from the shake of the press machine the metal came

down. And it didn't fall in the front but it fell in back of the press
machine. And my instincts, I went right behind the metal. (M207-208)

39.      In response to individual questions Mr. Mustafa testified that he put the

piece into the press brake without difficulty, removed his hands and put them away from the

machine (M221) next to his body (M222). Mr. Mustafa used his right foot to make the ram

descend bending the metal (M222). He did not remember how far into the pedal cover he put his

foot (M235). When the ram went up the metal was stuck to it (M222). Mr. Mustafa did not

remember if he took his foot off the pedal (M222). He did not remember whether he had taken

his foot out of the pedal when the ram was going up (M224-225). He testified that "I got

confused and I went to take it off from the ram to pull it off the ram" (M223). Mustafa put up his

hands to remove the stuck piece, but it fell before he reached it (M225). The piece fell into the

machine, less than one foot behind the ram, in a horizontal position (M227). Mr. Mustafa

instinctively reached in behind it (M228-229). He described the instinctive reaching in as an

"unwanted" or "undesired" move (M327). Mr. Mustafa testified that he did not remember where

his right foot was at the time. It could have been on the pedal (M229). He also testified that he

had his foot in the pedal housing but had no idea where the control station was (M229). He

believed that his foot remained inside the pedal housing during the entire time the accident took

place (M236, M229).

40.      Mr. Mustafa testified that he knew that if something unusual or

unexpected happened, he was supposed to turn off the machine (M331).

41.      Bezler testified that before the accident to Mr. Mustafa he had personally

experienced a workpiece falling behind the ram after being bent (FB77).  Bezler testified that he

shut the machine off by pressing down on the red button on the control station and walked

around to the back to remove the fallen piece (FB 77).

13

42.    After the accident there was an inspection at ELIOU by OSHA (AS 35-36). Andrew Scopelitis accompanied the OSHA inspector (AS 36). The OSHA inspector, among other things, explained to Andrew Scopelitis that the Control Station must be kept a certain minimum distance from the press brake (AS 102-103).

g.    Plaintiffs defect claims - Expert report and testimony

43.    Plaintiff's expert, Neal A. Growney P.E. issued a report with respect to this matter, dated June 3, 2005, and was deposed on September 15, 2005. A copy of Mr. Crowney's report, marked as an exhibit at his deposition, is annexed hereto as Exhibit F. It is Mr. Growney's opinion as set forth in Exhibit F, p.15 that the Accurpress 725012 press brake is defective in design because:

> 8.2 "... it provides for the means to bypass its Two-Hand controls safeguard ..."
>
> 8.5 "it fails to include the guards or devices (e.g. light curtain, fixed or movable guards, pull backs, restraints, etc.) necessary to safeguard Mustafa from its dangerous point of operation hazard when utilizing its foot pedal"
>
> 8.9 "Accurpress warnings are inadequate as it fails to warn of dangers operators are exposed to in utilizing this press brake's foot pedal mode."

Mr. Growney's testimony related to the defect opinions

44.    Mr. Growney testified that, in essence, the design of the press brake is defective because the designer provided for the utilization of the foot pedal actuating mechanism without designing into the press the necessary safeguards to protect an operator from injury (G93). In other words "it provides the means to bypass the two-hand control but that needs a corresponding component on the press which is the safeguard device. They go hand and [sic] hand" (G 109).

14

45.     Mr. Growney testified that if the press brake had an exclusive two hand control, without any foot pedal, it would not be defective (G109, 110).

46.     Mr. Growney testified that Mr. Mustafa did not have to hold the piece of metal he was bending at the time of the accident and that if the Control Station were put several feet away from the machine Mr. Mustafa could not have been injured (whether he did anything inadvertently or not) (G112). After so testifying Mr. Growney subsequently testified that placing the Control Station a "safe distance" from the machine (two to three feet away) so the operator puts the metal piece into the press brake and then walks back to the control station to step on the pedal, is "not a realistic production scenario" (G117). Mr. Growney conceded that the Control Station could be placed a safe distance from the press brake and that doing so would provide a means of keeping the operator's hands out of the point of operation if there were an inadvertent act of operation (G118).

47.     Mr. Growney testified that since Mr. Mustafa did not have to hold the metal piece to be bent, the Hand/Foot selector could have been set on the "Hand" mode (G118-119).

48.     Mr. Growney testified that training of the operator to remove his foot from the pedal and the housing between each activation could be part of the overall process of safety in the workplace (G124). In this regard Mr. Growney testified that he had read testimony by Bezler that the operator should be taking his foot out of the pedal (G99-100). Mr. Growney testified that if Mr. Mustafa had removed his foot from the pedal after making the bend at the time of the accident he would not have been injured (G132).

49.   Mr. Growney also testified that if one is going to reach through the point of operation he should certainly turn the power off, "if you are cognizant of what you are doing" (G98-99).

50.   Mr. Growney testified that he was aware that HALKIN offered the light curtain option to ELIOU and that ELIOU elected not to purchase it (G142).

Mr. Growney's Testimony related to warnings:

51.   Mr. Growney acknowledged that Mr. Mustafa was aware that if his hand was in the point of operation and the ram came down he could be injured (G131); and that at the time of the accident Mr. Mustafa instinctively put his hands into the point of operation (G70).

52.   As to the warning decals on the press brake, Mr. Growney testified that he had no objection to the triangular pictorial warning decals (G156). With respect to the written warning decal, Mr. Growney testified that the hazard requiring a warning is "having a part of your body caught in the point of operation" (G158) but that a warning to never place any part of your body within the die area is insufficient because it does not cover unintentional, inadvertent, placement (157-158). He also testified that the warnings on the decal were for ELIOU (so that it should place a point-of-operation safeguard on the machine) and for Mr. Mustafa, but since Mr. Mustafa could not read them (G159) ELIOU was obligated to communicate them to Mr. Mustafa (G160-161).

The basis for Mr. Growney's opinions

53.   Mr. Growney testified that in arriving at his opinions he takes into account ANSI Standards, OSHA Rules and Regulations and Labor standards (G48-49). In addition, he takes into account industry practice which consists of the "general rule" of engineers to protect safety, a rule similar to a doctor saying he was going to do what he can to help the patient (G50).

16

Mr. Growney testified that this general rule is the "hierarchy of safety controls" discussed by the National Safety Counsel (G51). It is an "overall engineering philosophy" (G52).

54. Mr. Growney testified that OSHA is applicable to employers (G149) and that he considers OSHA authoritative (G151). Mr. Growney testified that the New York State Industrial Code, 12 NYCRR 19 (as amended effective May 1, 1971) applies to employers in New York State (G151). Mr. Growney testified that he considers the National Safety Counsel authoritative (G137).

55. With respect to ANSI standards Mr. Growney relied only upon ANSI B 15.1 in his report (G120) but testified that ANSI B 15.1 governs guarding of mechanical power transmission apparatus, which is distinct from point of operation guarding (G120-121). Mr. Growney testified that in this case, there is no issue as to power transmission guarding relevant to his opinion, only point of operation guarding (G46).

56. In Mr. Growney's view, if a press brake is in compliance with the ANSI standards applicable to it, it could still be unsafe because the ANSI standards are a "minimum requirement of what you need to do in attempt to make a machine safe" (G56; G135). ANSI standards reflect industry practice (G61). The applicable ANSI standard for the Accurpress 725012 is ANSI B 11.3 1982 (G71-72, 88), which was the last ANSI B 11.3 revision before the subject press brake was manufactured in 1990. Mr. Growney testified that ANSI B 11.3 1982 is authoritative (G 87-88). Mr. Growney's report is barren of any reference to ANSI B11.3. He testified that he "consulted" it in forming his opinion (G87-88). Neither Mr. Growney's report nor his testimony includes an opinion that the subject press brake was not in compliance with ANSI B 11.3 1982.

57.     Mr. Growney testified that the ultimate question of whether a press brake is defective is not up to individual engineers (G56-57), "it's like common knowledge". It's a custom and practice (G57). To Mr. Growney industry practice - what the industry is doing - can be determined from industry publications and periodicals and industry groups (G58) which he considers informative, as opposed to authoritative, in arriving at his opinions (G58-59). Mr. Growney testified that industry publications, periodicals and industry groups are "not the final authority." The final authority is "whether your guy gets his hands crushed, that's the final authority" (G59).

58.     Mr. Growney testified that the basis for his opinions is: his education (G72); the literature described above (G72) [which is informative]; the applicable standards, codes, rules and regulations (G75) [of which only ANSI B 11.3 applies to manufacturers]; his experience in operating press brakes (G77-78); and his professional experience (G79). Mr. Growney testified that he uses no scientific approach in applying the foregoing individual bases (G79).

59.     Mr. Growney's report quotes the National Safety Council, Accident Prevention Manual (1985) with respect to safeguarding in general (Report 720 p. 8). In this regard Mr. Growney testified that based upon the accident Prevention Manual, "fundamental to the safeguarding means is thorough hazard or job safety analysis for operator exposure" (G139) which is the responsibility of the operator or employer (G140). Mr. Growney testified that the National Safety Council is saying that the issue of safeguarding is a function of, among other things, the feeding and removal of piece parts at the point of operation (G140) - which the manufacture is <u>not</u> involved in. Mr. Growney testified that the National Safety Counsel addresses

18

press brakes as a particular machine, but Mr. Growney did not cite those references in his report (G145).

> 60.     Mr. Growney's report states that power presses and press brake functions are virtually the same and can utilize the same safeguarding technologies (Report 7.13 p. 7). He testified, however, that manufacturers of guards distinguish between power presses and press brakes (G141).

> 61.     Mr. Growney testified that every article he referenced in his report is informative as opposed to authoritative (G142-148).

> 62.     It is respectfully submitted, without being exhaustive, that the foregoing establishes that:

> > a.     Mr. Mustafa was fully aware of the fact that there was no light curtain on the press brake; he knew that he did not have to reach into the point of operation for any reason; he knew that a machine should be off before putting his hand into it; his conduct was a gross overreaction to an occurrence that did not require immediate attention.

> > b.     The press brake had a number of safety features which, if utilized by plaintiff or ELIOU, would have prevented the injuries. The safety features include: safe distance (having the movable control station more than arms length from the point of operation); using the "Hand" mode where the bending process did not require the operator to use his hands while the bending was done; and removing the foot from the foot switch housing after bending.

> > c.     ELIOU was a thoroughly experienced user of press brakes and a thoroughly knowledgeable buyer of the subject press brake. The press brake complied with all standards applicable to it. ELIOU elected not to buy the light curtain option and was in the best position to make that judgment. The press brake was not unreasonably dangerous without the light curtain.

> > d.     Mr. Mustafa was fully aware of the danger posed by the point of operation; the danger was open and obvious; there were adequate pictorial and written warnings on the press brake; Mr. Mustafa's instinctive conduct negates a failure to warn claim.

e.   Mr. Growney's testimony is unreliable because it is based on generalities rather than specifics; ignores what is unfavorable to plaintiff; is lacking in scientific rigor; indicates a predisposition to the view that the press brake was the cause of the accident.

63.   For reasons set forth herein and the accompanying Memorandum of Law, HALKIN'S motion should be granted.

ISAAC SZPILZINGER ($I3 - 18 \mathrel{R}$)

Sworn to before me this
27th day of February, 2006

Notary Public

DEBORAH ANN HORAN
Notary Public, State of New York
No. 01HO4689838
Qualified in Queens County
Certificate Filed in New York County
Commission Expires August 31, 2009