# EXHIBIT G

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

ARBEN MUSTAFA,

                                                                        CV-00-4851 (DGT)

                              Plaintiff,

       -against-                                                       **AFFIDAVIT**

HALKIN TOOL, LTD.,

                              Defendant.
--------------------------------------------------------------------X
HALKIN TOOL, LTD.,

                              Third-Party Plaintiff,

       -against-

ELIOU STEEL FABRICATION, INC.,

                              Third-Party Defendant.
--------------------------------------------------------------------X

STATE OF NEW JERSEY          )
                             ) ss.:
COUNTY OF MIDDLESEX          )


       William B. Eaton, being duly sworn deposes and says:

       I am a licensed professional engineer who was retained by the attorneys for
Halkin Tool Ltd. to render engineering consulting services and opinions in this matter.  In
this capacity I issued a report dated July 12, 2005 and gave a deposition on September 29,
2005.

       What follows is my July 12, 2005 report, which I have sworn to on the date
indicated at the end of this document.

       As requested, I have reviewed file material concerning the captioned matter.  A
listing of this material is appended as Attachment 1.  I have also reviewed safety standards
and related safety information, a listing of which is appended as Attachment 2.
Additionally, on 12/7/01 I was involved in an inspection of the multipurpose hydraulic press
brake, associated with the metal forming system reportedly involved in the cited 6/3/98
accident, performed at Eliou Steel Fabrication, Inc., 319 Frost St., Brooklyn, NY.

Previously furnished photographs and videotape, taken during the inspection, and field notes compiled at that time are incorporated by reference as part of this report.

I am a licensed professional engineer.  Since 1974 I have been practicing as a licensed professional engineer in the engineering field, in particular with respect to the design and safety aspects of metal working machinery, point of operation safeguarding of metal forming systems, metal forming system equipment component control systems and performance of related production, set up and maintenance/remedial activities. Through my education, training and experience, I have knowledge of applicable codes and standards, industry custom and practice, as well as general safety information, related to power brake press machine tool design, care and use, point of operation safeguarding of metal forming system configurations involving press brake machine tools, and operational and safety training and instruction aspects related to performance of production, set up and maintenance/remedial activities associated with press brake metal forming equipment and related production systems.  A copy of my curriculum vitae is appended as Attachment 3.  I am a salaried employee of Affiliated Engineering Laboratories, Inc., 1101 Amboy Avenue, Edison, New Jersey 08837. I am a principal engineer in the firm.  Affiliated Engineering Laboratories charges $240/hr. for professional services furnished by staff principal engineers. I have appeared when requested for deposition and trial proceedings. Listings of deposition and trial appearances for the time period 6/01 to date are appended as Attachment 4.

In the matter in question, Mr. Mustafa sustained injury on 6/3/98 while working with a metal forming system at Eliou Steel Fabrication, Inc. [Eliou], 319 Frost Street, Brooklyn, NY. This production arrangement, designed and assembled by Eliou, included the subject hydraulic press brake as a component. The subject press brake is a multipurpose machine tool, designed and intended to be incorporated in a wide range of metal forming system arrangements, configured by the employer/user, capable of producing a vast array of sizes and shapes of parts, typically through the use of conventional bending dies, installed for the forming operation elected.  Material formed with the associated dies or tooling typically takes the finished form of single or multiple angled part formations.   It is common that conventional bending operations will necessitate operator involvement in positioning, supporting and/or following the material through the forming sequence. For this reason multipurpose press brakes normally include foot actuation as a standard operator control means. In basic form, a metal forming system involving a multipurpose press brake, such as the subject machine tool, includes: the press brake; the dies or tooling; the equipment actuation device(s); the material feeding/removal device(s) or method(s); and the point of operation safeguarding.

The subject press brake was manufactured in 1990 by Accurpress Mfg., Ltd., BC, Canada.  This machine tool was ordered by Eliou through Walsh-Atkinson Company, Inc. [Walsh-Atkinson], Hicksville, NY, an industrial equipment dealer.  As part of the purchase process, Walsh-Atkinson advised Eliou of various options available with the subject press brake. These included, in part: a power-operated back-gage; support arms for front gaging; two-hand control mounted on the ram instead of on the pedestal control station arrangement; a safety light curtain [presence sensing point of operation safeguard

device]; high speed/adjustable bending speed control; and tonnage control. For its production applications, Eliou elected to include the power-operated back-gage, and the high speed/adjustable bending speed control and tonnage control options as part of the subject press brake. Eliou declined to purchase the safety light curtain point of operation safeguard and the support arms for front gaging. The Terms and Conditions document associated with the Walsh-Atkinson sale of the subject press brake to Eliou contained a section entitled, "GUARDING", which advised of the OSHA-directed responsibility of the employer to provide safeguarding for every operation performed on all machines. According to the Walsh-Atkinson purchase order, the subject press brake was shipped in 1990 to Eliou Steel Fabrication, Inc., 130 Green Street, Brooklyn, NY. At the time of the accident in question the subject press brake was installed at the Eliou facility located at 319 Frost Street, Brooklyn, NY.  The press brake designer/builder, Accurpress Mfg., Ltd., had no contact with the subject press brake subsequent to that equipment leaving its custody and control in 1990.

File material and 12/7/01 inspection observations identified the subject multipurpose hydraulic press brake as an Accurpress, Model No. 725012, S/N 1710, tonnage – 250, bed length – 12', 12/90 date of manufacture. This equipment arrangement incorporated two-hand control and foot control actuation devices in a movable pedestal control station. The foot control was equipped with a fully shielded foot switch device with two independent anti-trip provisions in the form of entry gate and pedal toe-lock/release mechanisms. The entry gate blocked unintended access to the foot switch pedal, requiring raising the gate in order to permit foot entry. The toe-lock/release required forward pedal insertion to the frontal aspect of the pedal to release the anti-trip mechanism in order to allow downward pedal travel in response to foot actuation. A key-operated HAND/FOOT selector switch was included to afford supervisory regulation over the selected actuation control mode. Warning/instructional signage was carried on the front face of the press brake ram and an instruction manual was provided with the equipment purchase.   The warning/instructional signage included pictographic hand/finger hazard warnings and text signage that included, in part, warnings against placing any body part within the die area, not to operate the subject press brake without adequate safeguarding, and instructions to the employer with respect to implementation of those safety practices. The instruction manual furnished with the press brake included descriptions and explanations of the pedestal control station devices and functions, and forming set up control provisions.

During the 12/7/01 inspection the subject press brake was operated in two-hand and foot control modes in Jog, the set up mode, and Manual and Automatic production modes, as described in the instruction manual. Measurements of the foot switch device indicated the foot pedal operating surface was approximately 2" above floor level in the rest position. The outboard pedal edge was recessed ¾" inside the foot switch shield and 1¼" inside the surrounding pedestal control station housing. Overall pedal travel range was approximately 1¼". As inspected, the toe-lock/release anti-trip mechanism was inoperative and was situated in the released position. Measurement of the position of the toe-lock/release toe plate from the entrance of the pedestal control station housing indicated a distance of approximately 4¼" with the toe-lock/release mechanism in the

3

released position to allow foot switch actuation. The entry gate anti-trip mechanism was functional. The videotape taken during the 7/8/98 equipment inspection on behalf of the plaintiff also demonstrated an inoperative toe-lock/release anti-trip mechanism and a functional entry gate anti-trip mechanism on the footswitch device. Eliou employee deposition testimony indicated that no maintenance or repairs were performed on the foot switch prior or subsequent to the accident in question. The proximity of the 7/8/98 equipment inspection to the 6/3/98 accident occurrence provides indication that the operating condition of the foot switch observed on 7/8/98 may also had been the functional state of that device on 6/3/98. It was also noted that Eliou had added an in-house fabricated, adjustable front-gage/work-support assembly to the subject press brake.

Mr. Mustafa became an employee of Eliou on 6/1/98. His injury occurred on 6/3/98. According to his deposition testimony, Mr. Mustafa could not read English and was not conversant in the English language. Between 6/1/98 and 6/3/98 Mr. Mustafa received training in the operation of a power shear and the subject press brake from a co-worker, Mr. Frederick Bezler. Mr. Bezler was trained and experienced in press brake operation from prior employment and operating the subject press brake at Eliou. Mr. Mustafa testified that the communications between Mr. Bezler and himself, during training and his operation of the subject press brake on 6/2/98 and 6/3/98 prior to his injury, were non-verbal in character because of the language barrier, as Mr. Bezler was only conversant in English and Mr. Mustafa only in Albanian. He also indicated that he had not been provided with the instruction manual for the subject press brake. Further, during his on-the-job training to operate the subject press brake, none of the information on any warning/instructional signage or in the instruction manual was communicated to him by any Eliou personnel. Mr. Mustafa testified he had some 20 years of prior industrial machinery experience and understood the operating theory of a press brake, but had never operated that type machine tool until his employment at Eliou. He was cognizant of the safety practice of never reaching into any industrial machine unless it was turned off. He also recognized the pictograph hazard depiction on one of the warning sign types, two of which were affixed to the front face of the press brake ram. Mr. Mustafa indicated that Mr. Bezler made all necessary gaging and press brake set up adjustments for the forming operations he observed, as they were demonstrated to him, before he performed them in similar fashion to the instruction he had received. On 6/2/03 Mr. Mustafa received demonstrative training and operated the subject press brake in a metal forming system arranged to produce stair step elements, which required a multi-bend forming sequence that involved front and rear gaging. Eliou had added an in-house fabricated, adjustable front-gage/work-support assembly to the subject press brake. Work support arms for front gaging were an available option from Accurpress Mfg., Ltd., that Eliou elected not to include as part of the subject press brake equipment. The subject press brake was set for foot control actuation, as was the practice at Eliou for operation of the subject press brake for its metal forming operations. Mr. Mustafa testified that on 6/3/98 he and his co-worker/trainer, Mr. Bezler, had started the shift working to complete the multi-bend steps remaining from the previous day. That activity was interrupted in order to produce a quantity of "pour stops" needed for field installation on another project. The "pour stop" fabrication consisted of forming a single 90° bend along the longitudinal centerline of approximate 4' x 8" x ⅛" flat steel stock. The "pour stop" part formation involved

4

backgaging of the stock that was supported in position for the forming cycle by virtue of the front-gage/work-support setup and the lower die. This material positioning/supporting arrangement freed the operator from any hand contact requirement with the stock during part formation. According to Mr. Mustafa, Mr. Bezler made the necessary equipment adjustments for the forming operation and demonstrated the forming procedure by producing several parts. The flat steel stock was located behind the pedestal control station, which was positioned facing and approximately centered on the subject press brake. This production arrangement would require the operator to leave the normal operating position between bending operations to stack formed parts and accomplish the stock retrieval activity. The subject press brake remained set for foot control, although the "pour stop" bending procedure and the multi-bend step forming that had been underway on 6/2 and 6/3/98 were compatible with the use of the two-hand control provision. Following the part forming demonstration, Mr. Mustafa started to operate the involved metal forming system. He testified that he had just completed the formation of the first "pour stop" and, as ram/upper die upstroke travel commenced, the formed "pour stop" remained attached to the upper die. The part subsequently released from the upper die, fell and came to rest on the back-gage assembly, behind and in proximity to the lower die. Mr. Mustafa testified that this occurrence caused him to become confused and he responded through an instinctive reaction by reaching through the die area with both hands to retrieve the involved part. During this time, his foot remained within the foot switch device. While so involved, the foot switch device was actuated and a die closure was initiated. The extent of die closing travel that occurred caused the injury he sustained. Mr. Mustafa testified that in prior forming operations he had completed using the subject press brake he always took his foot "off" of the foot switch between forming cycles. It is unclear whether this description was meant to indicate the removal of his foot to the exterior of the foot switch device.

Eliou is a steel fabrication shop that has been in existence since approximately 1970. The business of Eliou includes production of metal steps, stairs and other structural steel forms. In addition to fabrication services, Eliou also performs field installation of items fabricated in its facility. From approximately 1972 to the purchase of the subject press brake in 1990, Eliou owned and operated another press brake for stair fabrication operations. That press brake was controlled by a mechanical foot pedal that was adjustable in location across the frontal aspect of the machine tool. No other operator control means was included. Eliou was experienced in press brake set up and operation to address production requirements involved in part formations associated with its business. In that regard Eliou fabricated and installed an adjustable, front-gage/work-support assembly for the subject press brake to accommodate its production requirements. The specifics of Eliou's daily production activities, as would be the usual case with fabrication shops in general, normally would not be within the practical knowledge or control of the designer/builder of press brake equipment utilized at such a facility. Typically, the type of products produced, the selection of equipment employed, the type of material(s) formed, the production setups elected and the training and operating practices and procedures followed are all determinations and/or choices routinely within the direct knowledge and practical control of the employer/user. At Eliou press brake maintenance and repair activities were also performed inhouse. Routine

observation of a metal forming process taking place within the die area furnishes graphic, redundant physical notice of the open and obvious danger and unmistakable potential injury risk where unregulated access to the tooling point of operation is permitted when the involved equipment is capable of operation. The operating experience that involved the original press brake and the subject press brake provided Eliou with sufficient notice of the potential hazards and injury risks associated with its metal forming operations, and of the need to ensure personnel were adequately trained and production setups were properly arranged to permit safe completion of metal forming activities associated with the subject press brake.

Design aspects applicable to the subject press brake at the time that equipment left the custody and control of Accurpress Mfg., Ltd. in 1990 are addressed in American National Standard ANSI B11.3-1982(R1994) Safety Requirements for Construction, Care, and Use of Power Press Brakes. Press brake construction aspects are covered under Section 4. By virtue of being furnished with two-hand control, as well as foot control, the subject press brake would fall into the category of multipurpose press brakes covered under 4.4 Special-Purpose Mechanical or Hydraulic Press Brakes. This section of the standard provides:

> 4.4.4.3 *Foot Control.* A foot control, if used, shall be protected so as to inhibit accidental actuation by falling or moving objects, or by someone stepping on it. . . . .
>
> 4.4.4.4 *Operator Control Station Selector.* If a two-hand operator control and a foot-control station is provided, the method of selecting between the two-hand operator's control or foot-control station shall be separate from the stroking control selector and shall be designed so that the selection of either may be supervised and controlled by the employer.

National Fire Protection Association NFPA 79 Electrical Standard for Industrial Machinery (1987 Edition), also in effect in 1990, addresses foot switch devices used to control industrial machinery as follows:

> 11-4 Foot-Operated Switches.
> (a) Foot-operated switches shall be protected to prevent accidental actuation by falling or moving objects and from unintended operation by accidental stepping onto the switch.

The subject press brake design, as provided by the designer/builder in 1990, conformed with these control system requirements.

DRAFT: MUSTAFA V. HALKIN: AFFIDAVIT OF WILLIAM B. EATON   IS/ric   February 9, 2006

Safe usage of a multipurpose press brake, such as the subject machine tool, involves proper operator training and instruction in conjunction with safe set up of the metal forming system that incorporates the press brake machine tool as a component. With respect to the accident in question, those responsibilities rested with Mr. Mustafa's employer, Eliou. This responsibility assignment is well recognized and is documented in published safety standards and regulations. The OSHA Act provides:

Duties

Sec. 5.(a) Each employer –
(1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees;
(2) shall comply with occupational safety and health standards promulgated under this Act.
(b) Each employee shall comply with occupational safety and health standards and all rules, regulations, and orders issued pursuant to this Act which are applicable to his own actions and conduct.

OSHA Part 1910.1 Purpose and Scope. provides for the adoption of national consensus standards, such as ANSI standards, to be part of the OSHA regulations. Under Part 1910.6 Incorporation by reference, the OSHA regulations indicate that any standard incorporated by reference has the same force and effect as standards set forth in Part 1910. The ANSI B11.3 standard, a national consensus standard, has been adopted by OSHA as the appropriate standard regarding power press brake usage. OSHA Instruction CPL 2-1.25 Subject: Guidelines for Point of Operation Guarding of Press Brakes provides: . . . .

7.      Safeguarding of power press brakes is covered by
American National Standards Institute standard ANSI B11.3-1982. OSHA recognizes this ANSI standard as the national consensus standard covering power press brakes guarding. . . . .

ANSI B11.3-1982(R1994), which was in effect prior to and at the time of Mr. Mustafa's 6/3/98 injury, provides under Section 6. Use:

6.1 *Employer Responsibility*
6.1.1 *Safety Standard Compliance*. It shall be the responsibility of the employer, whether or not the

7

employer is the owner, to ensure that the power press brake is in compliance with 1.3 prior to its use, and to provide safe tooling, safeguarding, and safe operating conditions for his employees.

6.1.2 *Training Responsibility.* It shall be the responsibility of the employer to exercise care in the selection of employees, to train employees in the care, setup, and use of power press brakes in individual piece-part bending operations. . . . .

6.1.3 *Enforcement Responsibility.* It shall be the responsibility of the employer to establish, monitor, and enforce appropriate rules for safe operation of power press brake operating procedures . . . .

6.1.4 *Safeguarding the Point of Operation.* It shall be the responsibility of the employer, after selecting the tooling and specific type of power press brake for producing a piece part, to evaluate that operation before the piece part is worked (bent, etc) and to provide point-of-operation safeguarding according to the provisions of 6.1.4(1). . . .

6.3 *Supervisory Responsibility.*
The employer shall provide adequate supervision to ensure that:
(1) The designated safeguarding means are installed, functional, and used;
(2) The designated work methods are used; and
(3) When necessary, the prescribed hand-feeding tools are used.
The employer may assign the responsibilities of this section to a responsible individual employee.

6.3.1 *Supervision of Personnel.* Supervisory personnel shall not allow employees to place their hands, fingers, or any part of their body within the point of operation.
They are also responsible to ensure that die setters, leadmen, operators, helpers, etc, know and practice a safe method of performing a piece-part operation.
Supervisory personnel are responsible for training new employees as well as employees newly assigned to their department and to ensure that all

employees follow safe operating practices, die-setting procedures, and the provisions of this standard. . . . .

OSHA Part 1910.212 General requirements for all machines. provides:

(a) Machine guarding – (1) Types of guarding. One or more methods of machine guarding shall be provided to protect the operator and other employees in the machine area from hazards such as those created by point of operation, ingoing nip points, rotating parts, flying chips and sparks. Examples of guarding methods are – barrier guards, two-hand tripping devices, electronic safety devices, etc. . . .

(3) *Point of operation guarding*. (i) Point of operation is the area on a machine where work is actually performed upon the material being processed.

(ii) The point of operation of machines whose operation exposes an employee to injury, shall be guarded. The guarding device shall be in conformity with any appropriate standards. . . .

NY Industrial Code Rule 19, which was in effect in 1990 and had been in effect prior to the time of the accident in question, indicates:

19.3 Responsibility. Every employer shall be responsible for carrying out the provisions of this Part (rule). Every employee shall be responsible for carrying out all rules which immediately concern or affect his conduct, and shall use safety devices furnished for his protection.

19.8 Guarding point of operation of dangerous machinery and other hazards.
(a) Machines having a grinding, shearing, punching, pressing, squeezing, drawing or cutting action, in which the operator's hand may come within a danger zone, shall be guarded in one of the ways specified in this Part (rule). . . .

9

DRAFT: MUSTAFA V. HALKIN: AFFIDAVIT OF WILLIAM B. EATON   IS/ric   February 9, 2006

It is clear from these authoritative safety standards and regulations that Eliou was directly responsible for ensuring Mr. Mustafa was properly trained, instructed and supervised to ensure his use of safe practices and procedures in the performance of his work activities. It is equally clear that Eliou was responsible for ensuring metal forming systems that incorporated the subject press brake as a component were properly set up to permit operator use without exposure to any unreasonable injury risk. This would include furnishing point of operation safeguarding that was compatible with the involved production operation and effective in the operator protection provided. In this regard National Safety Council Data Sheet I-490-Rev.85 Press Brakes provides:

> 11. The final component necessary to complete a functional press brake production system is the safeguarding means or component. Fundamental to this is a thorough hazard or job safety analysis for operator exposure, if any, created by considerations such as the tooling component and the feeding and removal of piece-parts at the point of operation. It must be remembered that the safe combination of components for one production system may not be a safe combination of components for another piece-part production system. Each new combination of piece-part, press brake, tooling, loading and unloading procedure, requires a hazard analysis for selection of the proper safeguarding means. Often a change in more than one of the system components may be required to provide for a safe production system.

Only Eliou was in a realistic position to practically control the arrangement of the metal forming system Mr. Mustafa was required to operate at the time of his injury. The press brake designer/builder would have had no foreseeable knowledge of or ability to control the configuration of that production setup or regulate the related work activities of Mr. Mustafa.

The employer's responsibility to provide appropriate point of operation safeguarding for metal forming systems incorporating press brake components applies equally to production systems utilizing other multipurpose machine tool designs, such as mechanical or hydraulic presses. Press brakes and power presses differ in design characteristics, as evidenced by separate ANSI standards for each, and the specific exclusions set forth with respect to design aspects of the equipment involved. For example, American National Standard ANSI B11.1-1988(R1994) Safety Requirements for Construction, Care, and Use of Mechanical Power Presses states:

> 1.1.1   Exclusions. Excluded from the requirements of this standard are: . . . .
> -   Hydraulic power presses (see ANSI B11.2-1982) . . . .

10

- Power press brakes (see ANSI B11.3-1982) . . .

American National Standard ANSI B11.2 – 1982 Safety Requirements for Construction, Care, and Use of Hydraulic Presses provides:

> 1.1 *Scope*. The requirements of this standard cover a wide variety of hydraulic power presses in terms of size, tonnage, slide speed, production rate, type of operation, power supply, and control circuits. Specifically excluded from this standard are: . . . mechanical power press, . . . power press brakes . . . .

ANSI B11.2-1995 sets forth like exclusions. American National Standard ANSI B11.3-1982(R1994) Safety Requirements for Construction, Care, and Use of Power Press Brakes also clarifies the application of that standard to machine tools classified by the generic term "press brake" as follows:

> 1.  Scope, Purpose, and Application
>
> *1.1  Scope*. The requirements of this standard apply to powered machines constructed with a plate-type ram or slide, and plate-type bed, classified by the generic term "press brake." This machine is sometimes referred to as a "bending brake" or a "brake press." . . . .

Employer responsibilities under OSHA regulations provide the following:

> OSHA Part 1910.217(7-1-90) Mechanical power presses.
> (5) *Excluded machines*. Press brakes, hydraulic and pneumatic power presses, . . .

OSHA Part 1910.217(7-1-97) provides like exclusions.

Despite machine tool component design differences, and related variations in tooling and material handling equipment design aspects, the employer's responsibility for safeguarding related metal forming systems remains the same. This is because, regardless of the machine tool component involved, the employer retains direct knowledge and control over the production setup selected and the manner in which that equipment arrangement is utilized. OSHA Part 1910.217(7-1-90) Mechanical power presses. provides:

> (c) *Safeguarding the point of operation* – (1) *General requirements*. (i) It shall be the responsibility of the employer to provide and insure

11

> the usage of "point of operation guards" or properly applied and adjusted point of operation devices on every operation performed on a mechanical power press. . . .

OSHA Part 1910.217(7-1-97) indicates the same employer responsibility. ANSI B11.1-1988(R1994) set forths:

> 6   Safeguarding the point of operation
>
> 6.1   Responsibility   The employer shall have the responsibility to provide and ensure that point-of-operation guards or devices are used, checked, maintained, and, where applicable, adjusted on every operation performed on a production system for every individual exposed to a point-of-operation hazard. . . .

ANSI B11.2-1982 indicates:

> 5.   Safeguarding the Point of Operation
>
> *5.1   Responsibility.* It shall be the responsibility of the employer to provide and ensure the usage of either a point-of-operation guard or a properly applied and adjusted point-of-operation device for every operation performed on a hydraulic power press consistent with the requirements of the tooling (dies) being used, or other features unique to the operation, so as to provide maximum protection to the operator.

ANSI B11.2-1995 provides similar requirement. It is clear from these recognized, authoritative sources that the employer's responsibility for point of operation safeguarding of metal forming system production operations has remained the consistent, recognized and accepted engineering design and safety practice for metal working machine tool equipment applications.

Based upon the file material reviewed, the 12/7/01 equipment inspection, reviewed safety standards and associated safety information related to the subject multipurpose hydraulic press brake machine tool design, installation and/or usage, industry custom and practice related to such press brake equipment usage, and my engineering education, knowledge, and industrial and consulting experience, the following opinions, which are to a reasonable degree of engineering certainty, are offered concerning the accident in question:

12

1.      The subject Accurpress multipurpose hydraulic press brake was reasonably safe in design, in keeping with recognized and accepted engineering design and safety practice, and industry custom and practice. This press brake did not violate any applicable design or safety standard addressing the construction of such a machine tool in effect at the time the equipment left the custody and control of the press brake designer/builder, Accurpress Mfg., Ltd., in 1990, in any respect that represented a causal factor in the injury Mr. Mustafa sustained.  In particular, the subject press brake design incorporated a physical arrangement and associated control system that allowed for safe production use in conjunction with construction requirements set forth in the prevailing American National Standard ANSI B11.3, and employer use requirements set forth in OSHA Part 1910.212 safety regulations, OSHA-adopted ANSI B11.3 provisions and NY Industrial Code Rule 19.

2.      The subject Accurpress multipurpose hydraulic press brake was reasonably safe for the intended industrial use and did not exhibit any design defect or deficiency that was causal to the accident in question.  This multipurpose hydraulic press brake was provided with control system provisions, an integral point of operation safeguarding facility, design compatibility for application with conventional point of safeguarding alternatives, and warning/instructional signage and instruction manual information to permit employment as a machine tool component in a reasonably arranged metal forming system, that would allow for completion of the intended production function in a safe and acceptable manner, without involved personnel exposure to any unreasonable risk of injury.

The control system integral to the subject press brake incorporated a two-hand control that qualifies as a point of operation safeguard in compatible metal forming system setups. The subject press brake also furnished foot control regulation. The provision of both hand and foot control capabilities is a recognized operator control configuration for a multipurpose hydraulic press brake. Reasonably foreseeable use of a multipurpose press brake anticipates a predominant necessity for employment of foot control regulation in metal forming systems performing conventional bending operations. Absent such control capability, the practical utility of this type machine tool would be inordinately compromised. The provision of hand and foot control functions, as integral press brake control system facilities, is recognized by and conforms with ANSI B11.3 standard provisions.

The foot control furnished with the subject press brake incorporated a fully shielded foot switch device, equipped with independent anti-trip provisions in the form of entry gate and pedal toe-lock/release mechanisms. This type of design exceeds safety provision requirements for foot switch devices applied to multipurpose press brake machine tools, as delineated in ANSI B11.3 and

NFPA 79 standards in effect at the time the subject press brake left the custody and control of the designer/builder in 1990.

The hand/foot control provision furnished integral to the subject press brake control system, and the control devices and arrangement employed to provide those operator control capabilities, were in keeping with ANSI B11.3 requirements, industry custom and practice, and recognized and accepted engineering design and safety practice prevailing in 1990. There is no engineering basis to reasonably conclude that the subject press brake was defective or unreasonably dangerous because of the inclusion of such a control provision, or that the operator control means furnished exhibited any inadequacy or lack of provision that was causal to the injury Mr. Mustafa sustained.

3.      Warning/instructional signage carried on the subject press brake proper and furnished instruction manual information did not exhibit any inadequacy or lack of provision that was a causal factor in Mr. Mustafa's injury.

Mr. Mustafa testified in deposition that at the time of the accident in question he could not read nor was he conversant in the English language. He also testified that from his previous 20 some years of industrial machinery experience and his operation of the subject press brake before his accident, he recognized and appreciated the hazard and injury risk from exposure to the die operating area. He also recognized the pictograph hazard depiction on one of the warning sign types, two of which were affixed to the front face of the press brake ram. Independently, Mr. Mustafa's routine observation of a metal forming process taking place within the die area furnished graphic, redundant physical notice of the open and obvious danger and unmistakable potential injury risk where unregulated access to the tooling point of operation is permitted when the involved equipment is capable of operation. This warning notification is equally self-evident to operating, set up and supervisory personnel and provides as positive a communication as warning signage/instruction manual content intended to transmit the same information. In this regard Mr. Mustafa testified that at the time of his injury he had become confused by the formed "pour stop" part remaining attached to the upper die for a short time, before it released and came to rest on the back-gage assembly behind and in proximity to the lower die. Because of his confusion, Mr. Mustafa testified that his attempt to retrieve the formed part from behind the lower die was triggered by an instinctive reaction. He gave no thought to or consideration of the potential hazard and injury risk he understood was present because of the die area access he elected. Warning/instructional signage and/or instruction manual information, regardless of content or design, is not intended nor would be practically capable of countering such behavior. Prior to his injury, Mr. Mustafa and Eliou personnel responsible for monitoring his work activities were

14

furnished with sufficient notice of the potential point of operation exposure hazard and injury risk associated with the metal forming system he was operating to have assured a setup that would have avoided the accident in question.

There is no engineering basis to reasonably conclude that additional or alternative warning/instructional signage or instruction manual information would have altered the behavior of Mr. Mustafa or other Eliou personnel in a manner that would have assured prevention of the injury he sustained. Reasonable response to warning/instructional information provided by the press brake designer/builder, as well as the exercise of common sense safety practice, would have allowed involved metal forming system operations to have been arranged and performed in a safe and acceptable manner, without personnel exposure to any unreasonable injury risk. By so doing, Mr. Mustafa's injury would not have occurred.

4.      The subject press brake design was not defective, unreasonably dangerous or causal to Mr. Mustafa's injury because a presence sensing device or other conventional guard or device was not incorporated as a point of operation safeguard with the Accurpress equipment arrangement provided by the designer/builder in 1990.

The subject press brake is a multipurpose machine tool intended to be utilized in numerous metal forming systems, each requiring an analysis of material geometry, tooling and type of bending operation to be performed, method of material feeding, positioning and/or supporting, type and location of system actuation device(s) and method of formed material handling and removal to determine what point of operation safeguarding means or other assisting device(s) should be furnished as part of that manufacturing arrangement to accomplish the production function without posing any unreasonable danger or hazard to involved personnel. In order to furnish a viable and effective safety function, the safeguarding means applied to a particular metal forming system must adequately address the prevailing point of operation exposure, while concurrently being compatible with the production operation being performed. The suitability of any type of safeguarding can only be properly determined in light of the design of the particular metal forming system involved, and cannot be effectively evaluated solely on the basis of the design of the press brake, which represents only one component of a particular manufacturing arrangement. There is no single point of operation safeguarding means that is universal in nature and capable of furnishing effective protection and functional compatibility, irrespective of prevailing production setup constraints.

The control system of the subject press brake included a two-hand control that qualifies as a point of operation safeguard in compatible metal forming systems. At the time of the accident in question, the involved metal forming

15

system did not require operator hand contact with the material during part formation. As a result, the press brake control system should have been selected for hand control with the key-operated HAND/FOOT selector switch locked in HAND mode. This would have furnished a point of operation safeguarding means for the involved metal forming system that would have prevented the accident in question. As Eliou did not furnish any other alternative point of operation safeguarding, use of the two-hand control, integral to the subject press brake, provided a readily available and viable protective means that should have been employed. Use of this control provision provided a point of operation safeguarding function that required no alteration of or addition to the press brake design originally furnished in 1990. Use of the two-hand control was compatible with the forming operation with which Mr. Mustafa was involved when his injury took place. Had Eliou taken advantage of that control facility, the 6/3/98 accident would not have occurred. The failure of Eliou to utilize the press brake two-hand control provision or furnish an alternative point of operation safeguarding means for the metal forming system Mr. Mustafa was required to operate violated prevailing OSHA Part 1910.212 regulations and OSHA-adopted ANSI B11.3 standard provisions, which were directed to and with which the employer, Eliou, was responsible to conform.

At the time the subject press brake left the custody and control of the designer/builder in 1990, applicable design aspects set forth in the prevailing ANSI B11.3 standard and use regulations in OSHA Part 1910.212, NY Industrial Code Rule 19 and OSHA-adopted ANSI B11.3 provisions did not require the inclusion of a presence sensing device or other alternative point of operation safeguard as an integral component of a multipurpose press brake design. No such inclusion was dictated by recognized and accepted engineering design and safety practice, or industry custom and practice. Additionally, in light of the configuration of the in-house fabricated, adjustable front-gage/work-support assembly added to the subject press brake, there is sufficient engineering basis to question whether conventional application of a presence sensing device would have been compatible with the range of metal forming system setups and operations performed at Eliou to ensure adequate point of operation protection for involved personnel. Reviewed discovery indicated Eliou was apprised of the availability and function of a "safety light curtain" (presence sensing device) as an option prior to purchase of the subject press brake. Eliou elected not to include that provision with the other options selected to be part of the Accurpress equipment arrangement. Further, as Eliou elected not to utilize the safety function provided by the two-hand control, integral to the subject press brake, in the involved metal forming system setup, as well as in reported prior production operations, there is insufficient engineering basis to reasonably conclude that a presence sensing device, if available, would have been employed or utilized on 6/3/98 in a manner that would have assured prevention of the injury Mr. Mustafa sustained. Likewise, there is no

16

assurance that the inclusion of some other safeguarding means, as part of the subject press brake design, would have allowed compatibility, concurrently provided effective protection and/or been utilized, irrespective of the metal forming system Eliou arranged for production use.

In any event, the inclusion of appropriate point of operation safeguarding for the metal forming system that incorporated the subject multipurpose press brake on 6/3/98 was the responsibility of the employer/user, Eliou, as mandated by prevailing OSHA Part 1910.212 and OSHA-adopted ANSI B11.3 requirements. There is no engineering basis to reasonably conclude that the subject press brake was defective or unreasonably dangerous for the intended industrial use because a presence sensing device or other conventional point of operation safeguard was not included as an integral component of that equipment arrangement when furnished to Eliou in 1990.

5.      The failure of Mr. Mustafa to exercise reasonable care for his own safety was the proximate cause of the injury he sustained.

Mr. Mustafa indicated in deposition testimony that he had no difficulties operating the subject press brake to perform his job function between 6/1/98 and his injury on 6/3/98. Mr. Mustafa testified that, although he had not operated a press brake before his employment at Eliou, his prior industrial machinery knowledge and experience provided him sufficient understanding of the function of the subject press brake and appreciation for the potential danger and injury risk from exposure to the point of operation of the installed dies. He was cognizant of the safety practice of never reaching into an operational aspect of any industrial machine without first ensuring that equipment was turned off.

On 6/3/98 the press brake was set for foot control, although the bending procedure was compatible with the use of the available two-hand control provision. As the press brake ram/upper die commenced upstroke travel after die closure to complete the formation of the first "pour stop" he produced, Mr. Mustafa testified that the "pour stop" remained attached to the upper die. This caused him to become confused. The part subsequently detached from the upper die, landed and came to rest on the back-gage assembly behind and in proximity to the lower die. Mr. Mustafa testified that, as a result of being confused, he then reached between the dies, as a consequence of an instinctive reaction, to retrieve the involved part. Prior to doing so, he made no attempt to remove his foot from the foot switch device or secure the press brake from operation by available press brake control device or electrical power supply disconnect switch usage. While so involved, the foot switch device was actuated and a die closure was initiated. The extent of die closing travel that occurred caused the injury Mr. Mustafa sustained.

DRAFT: MUSTAFA V. HALKIN:  AFFIDAVIT OF WILLIAM B. EATON   IS/ric   February 9, 2006

The actions of Mr. Mustafa that resulted in the accident in question reflected a failure on his part to exercise ordinary care for his own safety. The procedure he attempted at that time posed an open and obvious danger to him, contradicted his own industrial experience and machine safety practice, the training and instruction he reportedly received at Eliou concerning the operation and use of the subject press brake, and warning/instructional signage carried on that equipment. Mr. Mustafa testified that he recognized the pictograph hazard depiction on one of the warning sign types, two of which were affixed to the front face of the press brake ram. Had Mr. Mustafa responded to the part retrieval task in a reasonable manner, his injury would not have occurred, irrespective of any other prevailing condition or circumstance. If Mr. Mustafa had exercised no other precaution but the removal of his foot from the foot control, rather than having it prepositioned in the foot switch device to effect actuating contact, the accident in question would have been prevented.

6.      There is sufficient engineering basis to reasonably conclude that the failure of Eliou to properly train, instruct and/or supervise the practices and procedures followed by Mr. Mustafa in the performance of his work activities represented a causal factor in the injury he sustained.

Mr. Mustafa testified he had never operated a press brake until he was employed at Eliou. He also testified that he had extensive industrial machinery experience and understood the function of the subject press brake. According to Mr. Mustafa, his on-the-job training at Eliou did not include communication by Eliou of any warning/instructional information carried on the subject press brake or in the instruction manual. At the time of his injury, Mr. Mustafa testified he had become confused because the first "pour stop" he had formed remained attached to the upper die on ram/upper die upstroke travel. That part subsequently detached from the upper die, landed and came to rest on the back-gage assembly behind and in proximity to the lower die. Mr. Mustafa had not experienced this type of situation in the other part forming operations he was involved in at Eliou, and the proper procedure to follow under such a circumstance was not covered in his training. Because of his confusion, he testified he reacted instinctively when he reached through the die area to retrieve the formed part. Mr. Mustafa's response to the stuck part condition was a gross overreaction to an occurrence that did not require immediate attention, as it posed no danger to himself, or any potentially detrimental effect with respect to the formed part or the equipment involved. It is clear that Mr. Mustafa's training had not adequately prepared him to properly respond to the production problem that took place. Eliou personnel bore the responsibility to ensure communication to him of all operational and safety practices and procedures necessary to allow Mr. Mustafa to perform his work activities without exposure to any unreasonable risk of injury. This included, in part, avoidance of hand exposure to the die operating area with the press brake equipment operational, proper positioning of the press brake

18

pedestal control station for the forming operation elected, necessity for total foot removal from the foot switch device between bending cycles when material handling required proximity to the die area, and the safe procedure(s) to follow with respect to retrieval of a part that stuck to the tooling after a bending sequence or that became deposited in an abnormal or unexpected position after formation.

The failure to provide appropriate training, instruction and/or supervision on the part of Eliou, Mr. Mustafa's employer, was contrary to OSHA requirements and OSHA-adopted provisions of the ANSI B11.3 standard. Had Eliou properly exercised its responsibility in this regard, the accident in question would not have occurred.

7.       The 12/7/01 equipment inspection confirmed the foot switch toe-lock/release anti-trip mechanism was inoperative. The entry gate anti-trip provision was operational. These same conditions were present on 7/8/98. Given Mr. Mustafa's deposition testimony with respect to him having left his foot in the foot switch device when he reached through the die area to attempt retrieval of the part that had been formed, and the absence of any evidence the die closure involved in his injury was caused by any equipment related misoperation, there is a potential that his foot position may not have been sufficient to have effected release of a functional toe-lock/release provision. Consequently, the foot switch actuation that commanded the die closure that caused his injury would not have been initiated.

It is important to recognize that on 6/3/98 any foot location in the foot switch that enabled foot pedal contact to effect device actuation could not have transpired as a result of inadvertent or unintentional foot entry from the exterior, because of the functional entry gate anti-trip mechanism. That provision had to have been cleared before any foot pedal access was available.   In order for the condition of the toe-lock/release anti-trip mechanism to have been relevant to the accident in question, Mr. Mustafa's foot first had to have been intentionally placed inside the foot switch in position to allow for foot pedal contact. Subsequent actuation then would have been dependent upon release of the toe-lock/release anti-trip mechanism. If Mr. Mustafa's foot was not in a position within the foot switch device to concurrently release the toe-lock/release mechanism when he actuated the foot switch, which commanded the die closure that caused his injury, then the foot switch had not been maintained in good working order. Proper functioning of both anti-trip mechanisms was readily verifiable by visual observation or routine operation of the foot switch device.

If the foot switch toe-lock/release anti-trip mechanism was inoperative and permitted foot switch actuation that would otherwise have been prohibited, then the failure of Eliou to have properly inspected and maintained the foot switch device in good working order was a causal factor in the injury Mr.

Mustafa sustained. The failure of Eliou to properly execute its responsibility in this regard would have been contrary to the exercise of reasonable care for employee safety and would have been violative of OSHA and OSHA-adopted ANSI B11.3 requirements.

8.      In sum, the subject Accurpress multipurpose hydraulic press brake exhibited a design that was reasonably safe for the intended industrial use when that equipment left the custody and control of the design/builder, Accupress Mfg., Ltd., in 1990.   The machine tool configuration and instruction materials provided did not display any inadequacy or lack of provision that was a causal factor in the 6/3/98 injury Mr. Mustafa sustained.

I reserve the right to augment and/or amend the opinions set forth in this report, should additional information be provided for review and evaluation that warrants such action.


William B. Eaton, P.E.


Sworn to before me this
9th day of   February, 2006

Notary Public

DOLORES FITZGERALD
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires June 30, 2007

Re:   Mustafa vs. Halkin Tool, Ltd., et al
      July 12, 2005
      Page 21 of 24

Attachment 1

File materials reviewed included the following:

Plaintiff's Summons & Verified Complaint; Defendant Halkin Tool Ltd.'s Answer to Verified
Complaint; Defendant's Initial Disclosure F.R. Civ. P. Rule 26(a)(1); Defendant Halkin Tool,
Ltd.'s Answers to Plaintiff's First Set of Interrogatories and Request for Production; Defendant
Halkin Tool, Ltd.'s Response to Plaintiff's Amended First Set of Interrogatories and Requests for
Production to Defendant Halkin; Defendant Halkin Tool, Ltd.'s Response to Eliou Steel
Fabrication's First Set of Interrogatories and Requests for Production to Third-Party Plaintiff
Halkin Tool, Ltd.; Third-Party Defendant's Initial Disclosure F.R. -- Civ. P. Rule 26(a)(1);
Plaintiff's Initial Disclosure; Plaintiff's Response to Defendant Halkin Tool, Ltd.'s Interrogatories;
Plaintiff's Response to Defendant Halkin Tool, Ltd.'s Request for Production of Documents; Third-
Party Defendant's Response to Defendant's Rule 33 Interrogatories Request; Plaintiff's Response
to Third-Party Defendant's Rule 24 Request for Production of Documents; Third-Party Defendant
Eliou Steel Fabrication, Inc.'s Response to Plaintiff's Amended First Set of Interrogatories and
Requests for Production to Third-Party Defendant; Third-Party Defendant's Supplemental
Response to Defendant's Rule 34 Request; 5/1/01 O'Connor & O'Connor, LLP correspondence
and attached document related to Defendant's Rule 34 Request; Defendant Halkin Tool, Ltd.'s
Response to Plaintiff's Second Set of Requests for Production to Defendant Halkin; 7/8/98
videotape of equipment inspection conducted by plaintiff; 4/5/01 equipment inspection photographs
by Defendant Halkin Tool, Ltd., and DVD of equipment inspection conducted by the parties;
12/7/01 videotape of equipment inspection by Third-Party Defendant Eliou Steel Fabrication, Inc.,
4/18/02 deposition transcript of Colin Dean Albrecht; 5/24/02 & 8/30/02 deposition transcripts of
Frederick Bezler; 8/2/02 deposition transcript of Peter Eliou; 5/24/02 deposition transcript of
Patrick Leach; 3/7/02 & 4/1/02 deposition transcripts of Arben Mustafa; 4/15/02 deposition
transcript of Andrew Scopelitis; 5/10/05 deposition transcript of  Andonis Eliou; deposition
exhibits; 6/3/05 engineering opinion report of Neal A. Growney, P.E.

Re:   Mustafa vs. Halkin Tool, Ltd., et al
      July 12, 2005
      Page 22 of 24

Attachment 2

Safety standards and safety information reviewed included the following:

Occupational Safety and Health Act of 1970 (Public Law 91-596); Occupational Safety and Health Standard OSHA Part 1910.1 through Part 1910.6; Occupational Safety and Health standard OSHA Part 1910.212; Occupational safety and Health standard OSHA 1910.217; OSHA Instruction STD. 1-12.12/ OSHA Program Directive #100-44 (Revision#1); OSHA Instruction CPL 2-1.25; 12 NYCRR 19 State of NY Industrial Code Rule 19; American National Standard ANSI B11.1-1988(R1994) Safety Requirements for Construction, Care, and Use of Mechanical Power Press; American National Standard ANSI B11.2-1982 & 1995 Safety Requirements for Construction, Care, and Use of Hydraulic Presses; American National Standard ANSI B11.3-1973 Safety Requirements for Construction, Care and Use of Power Press Brakes; American National Standard ANSI B11.3-1982 Power Press Brakes - Safety Requirements for Construction, Care and Use; American National Standard ANSI B11.3-1982 (R 1994) Power Press Brakes – Safety Requirements for Construction, Care and Use; American National Standard ANSI/ASME B15.1 – 1984 Safety Standard for Mechanical Power Transmission Apparatus and ANSI/ASME B15.1a – 1986 Addenda to ANSI/ASME B15.1-1984; American National Standard ANSI Z53.1-1979 Safety Color Code for Marking Physical Hazards; National Safety Council Power Press and Forging Newsletter January-February 1981; National Safety Council Data Sheet 419 Rev. 85 and Rev. 93 Press Brakes; National Fire Protection Association NFPA 79 Electrical Standard for Industrial Machinery – 1987 Edition.

Re:   Mustafa vs. Halkin Tool, Ltd., et al
      July 12, 2005
      Page 23 of 24

Attachment 3
Curriculum Vitae

# AFFILIATED ENGINEERING LABORATORIES, INC.

*Engineering Consultants*

1101 Amboy Avenue
Edison, NJ 08837-2856

Phone: (732) 225-0360

Fax: (732) 417-0165

**Resume:**                    **WILLIAM B. EATON**

**Education:**        Bachelor of Science - Mechanical Engineering
                     Rutgers University, New Brunswick, N.J. (1967)

                     Master of Science - Industrial Health & Safety Engineering
                     New Jersey Institute of Technology, Newark, N.J. (1977)

                     OSHA Mechanical Power Press Safety Course (May, 1976)

                     Fundamentals of Fire and Explosion Hazards Evaluation Seminar
                     American Institute of Chemical Engineers (August, 1976)

**Professional:**     Professional Engineer
                        - New Jersey License #21400 (1974)
                        - New York License #53651 (1976)
                        - California License #CS 4076 (1978)
                        - Pennsylvania License #34954-E (1985)

                     Fireman's License, Black Seal In-Charge, State of New Jersey
                     Department of Labor and Industry #B63969

                     Member of American Society of Mechanical Engineers

                     Senior Member of American Institute of Industrial Engineers

                     Member of Institute of Electrical and Electronics Engineers

                     Member of Society of Plastics Engineers, Inc.

                     Member of National Society of Professional Engineers

                     Professional Member of National Safety Council

                     Contributor: OSHA Presidential Task Force Hearings on Machinery
                                  and Machine Guarding (May, 1977)

**WILLIAM B. EATON**                          **- 2 -**

**Publication:**          Power Engineering magazine article entitled "Combustion Control Methods to Limit $NO_x$ Emissions"

**Professional Experience:**          **Public Service Electric and Gas Company,** Newark, N.J.

Lead Engineer, Controls Division, Engineering & Construction Department - Design and construction of electric power plants and control systems for power plant equipment (7 years)

Maintenance Foreman, Electric Production Department - In charge of electrical and mechanical equipment maintenance and overhauling operations (2 years)

**Engineering Consultant**

Design of electrical and control systems:
      Allied Chemical Corporation
      American Cyanamid Corporation
      Panel Control, Inc.
      Stauffer Chemical Company

Product liability and engineering failure investigations

Re:   Mustafa vs. Halkin Tool, Ltd., et al
      July 12, 2005
      Page 24 of 24

Attachment 4

Deposition and Trial Appearance Lists (6/01 to date)

William B. Eaton, P.E.

Depositions (6/01 to date)

| File No. | Caption | Date | Venue | Atty. Client |
|---|---|---|---|---|
| Q-3322 | Benton vs. Wean United, Inc.<br>Court of Common Pleas<br>Tenth Judicial Circuit<br>C.A. No. 98-CP-04-1384 | 6/26/01 | SC | C. William McGee, Esq. |
| Q-2752 | Jaroslawski vs. Kawaguchi, LTD, et al<br>Circuit Court For The County of Oakland<br>Case No. 99-017432 NP | 10/25/01 | MI | Paul Scheidemantel, Esq. |
| P-8939 | Murafsky vs. E.W. Bliss Co., et al<br>Middlesex County Superior Court<br>Docket No. MID-L-5549-98 | 11/28/01 | NJ | Charles T.McCook, Jr., Esq. |
| Q-1232 | Plymale vs. Motor Products Ohio Corp., et al<br>Summit County Court of Common Pleas<br>Case No. CV2000 01 4421 | 2/26/02 | OH | Christopher C. Esker, Esq. |
| Q-2032 | Huggins vs. Kvaerner U.S., Inc. vs. Siegel-Robert, Inc.<br>Case No. 992-8442 | 6/20/02 | IL | Stanford M. Bjurstrom, Esq. |
| Q-2530 | Whitley vs. Black & Decker (Farrel Corp.)<br>U.S. District Court<br>District of Maryland<br>MJG-00-CV-2094 | 10/3/02<br>(1st session) | MD | Daniel R. Lanier, Esq. |

1

| Q-2530 | Whitley vs. Black & Decker (Farrel Corp.) U.S. District Court District of Maryland MJG-00-CV-2094 | 12/4/02 (2nd session) | MD | Daniel R. Lanier, Esq. |
|--------|-----|-----|-----|-----|
| Q-5592 | Gutierrez vs. E.W. Bliss Company, et al Circuit County Cook County, IL No. 01 L 3603 | 2/3/03 | IL | Faustin A. Pipal, Jr., Esq. |
| Q-5051 | McGhee vs. Kobelco Stewart Bolling, Inc., et al Circuit Court of Lee County, Alabama Case No. CV-01-432 | 3/12/03 | AL | James R. Shaw, Esq. |
| Q-4032 | Adcock vs. Scandura Ohio, Inc. Court of Common Pleas Ottawa County, OH Case No. 00-CVC-084 | 12/15/03 | OH | Jeffrey J. Embleton, Esq. |
| Q-7240 | Pelletier v. Granutec, Inc., Superior Court Franklin County, ME Docket No. CV-03-15 | 5/5/04 | ME | Elizabeth G. Stouder, Esq. |
| Q-6213 | Tyler v.Kawaguchi, Inc., et al U.S. District Court Western District of NY CIV. No. 00-CV-6366T(B) | 8/11/04 | NY | Arthur H. Thorn, Esq. |

2

William B. Eaton, P.E.

Trials (6/01 to date)

| File No. | Caption | Date | Venue | Atty. Client |
|---|---|---|---|---|
| P-8749 | Merkel vs. Farrel Corp. C.A. No. 99-685 | 10/22/02 | US District Court Middle District PA Scranton, PA | Dean F. Murtagh, Esq. |

1