UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

ARBEN MUSTAFA,

                           Plaintiff,

      -against-

HALKIN TOOL, LTD.,

                        Defendant.
-----------------------------------------------------------------X

HALKIN TOOL, LTD.

          Third-Party Plaintiff,

     -against-

ELIOU STEEL FABRICATION, INC.,

          Third-Party Defendant.
-----------------------------------------------------------------X

CV-00-4851 (DGT)

**DEFENDANT'S
MEMORANDUM
OF LAW IN
SUPPORT OF
MOTION**

HERZFELD & RUBIN, P.C.
ATTORNEYS AT LAW
40 WALL STREET
NEW YORK, NEW YORK 10005

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
ARBEN MUSTAFA,

                                                        CV-00-4851 (DGT)

                         Plaintiff,

      -against-

HALKIN TOOL, LTD.,

                         Defendant.
------------------------------------------------------------------X
HALKIN TOOL, LTD.

              Third-Party Plaintiff,

      -against-

ELIOU STEEL FABRICATION, INC.,

             Third-Party Defendant.
------------------------------------------------------------------X

## DEFENDANT'S MEMORANDUM OF
## LAW IN SUPPORT OF MOTION

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

RELEVANT FACTUAL BACKGROUND ..................................................................1

    Plaintiff Arben Mustafa's Prior Employment in Metal Working .........................2

    Eliou Steel Fabrication, Inc. History and Purchase of Accurpress 725012 Press Brake .....3

    The Accurpress 725012 Press Brake ....................................................................4

    Use of the Accurpress Press Brake at ELIOU.......................................................5

    Arben Mustafa's Hiring and Employment at ELIOU ..........................................6

    The Day of the Accident–June 3, 1998.................................................................7

    Defect Claims – Plaintiff's Expert's Design Defect Opinions .............................8

    Plaintiff's Expert's Opinions on Warnings...........................................................9

    The Basis for Plaintiff's Expert's Opinions..........................................................9

    The Basis for HALKIN's Motion .......................................................................11

ARGUMENT .............................................................................................................12

POINT I
    PLAINTIFF WAS AWARE OF THE DANGER POSED BY THE POINT OF
    OPERATION.  HE CANNOT DEMONSTRATE THAT HIS INJURY COULD NOT
    HAVE BEEN AVERTED BY EXERCISE OF REASONABLE CARE...............................12

POINT II
    THE DESIGN OF THE PRESS BRAKE WAS NOT DEFECTIVE  BECAUSE HALKIN
    OFFERED ELIOU A LIGHT CURTAIN  AS OPTIONAL EQUIPMENT AND ELIOU
    ELECTED  NOT TO BUY IT ...........................................................................15

POINT III
    THE PICTORIAL AND WRITTEN WARNINGS PROVIDED BY HALKIN WERE
    ADEQUATE; THE DANGER WAS OPEN AND OBVIOUS AND PLAINTIFF WAS
    FULLY AWARE OF IT ....................................................................................19

POINT IV
    MR. GROWNEY'S TESTIMONY IS UNRELIABLE AND SHOULD BE
    PRECLUDED .............................................................................................21

CONCLUSION...........................................................................................................24

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

ARBEN MUSTAFA,                                    CV-00-4851 (DGT)

          Plaintiff,

    -against-                                     **DEFENDANT'S**
                                                  **MEMORANDUM**
                                                  **OF LAW IN**
                                                  **SUPPORT OF**
HALKIN TOOL, LTD.,                                **MOTION**

          Defendant.
---------------------------------------------------------------X
HALKIN TOOL, LTD.

      Third-Party Plaintiff,

    -against-

ELIOU STEEL FABRICATION, INC.,

      Third-Party Defendant.
---------------------------------------------------------------X

## PRELIMINARY STATEMENT

This Memorandum of Law is submitted together with the Affidavit of Isaac Szpilzinger, with Exhibits, including the affidavit of William B. Eaton, on behalf of defendant/third party plaintiff Halkin Tool, Ltd, (HALKIN) in support of its motion for summary judgment pursuant to F.R. Civ. P. Rule 56, dismissing the complaint.

## RELEVANT FACTUAL BACKGROUND

The relevant facts are fully set forth in the Affidavit of counsel with exhibits.  In essence, on June 3, 1998 plaintiff, Arben Mustafa, an employee of, Eliou Steel Fabrication, Inc. (ELIOU) was operating an "Accurpress" Model 725012 press brake (an industrial machine which bends metal), manufactured by HALKIN, when he sustained injuries to both of his arms below

the elbows.  Plaintiff sued HALKIN, a Canadian corporation, in New York State Supreme Court Kings County, claiming that the press brake, which ELIOU purchased new in 1990, was defective in design when operated in one of its two modes for failure to include a safeguard (light curtain) and for failure to warn.  The action was removed to this Court (diversity jurisdiction).  It is HALKIN's position that plaintiff will be unable to prove that his injury could not have been avoided by the exercise of reasonable care; that the design of the press brake was not defective because HALKIN offered ELIOU a safety light curtain as optional equipment; that its posted pictorial and written warnings were adequate and that the danger was open and obvious and that plaintiff was fully aware of it- and acted instinctively, contrary to his training and knowledge; and that the testimony of plaintiff's expert is unreliable and should be precluded, warranting summary judgment in HALKIN's favor.

Plaintiff Arben Mustafa's Prior Employment in Metal Working

Arben Mustafa (d.o.b. 6-29-56) became involved in metal working in 1970.  In 1972 Mr. Mustafa began a 21-year period of employment at a metal-forming factory in Albania. He started as a machinist and became a manager fourteen years later.  As a machinist Mr. Mustafa operated various metal-working machinery, including lathes, milling machines and drilling machines, and became familiar with the hazards associated with machine operation, particularly the hazard of coming into contact with moving machinery or moving work pieces in the machinery, both from written sources and from personal experience.  The machinery he operated had decals containing written hazard warnings (in Albanian) and hazard pictorials.

As manager, starting in 1986, Mr. Mustafa was in charge of all the machinery and employees in one part of the factory, a total of 90 machines, and 120 to 130 employees.  He was

-2-

a manager until 1993, when the work "ended".  After coming to the United States in 1996 Mr.

Mustafa worked as a machinist in a machine shop repairing broken machine parts; as a lathe

operator; and as a machine mechanic for envelope machinery, before coming to work for ELIOU

on June 1, 1998.

Eliou Steel Fabrication, Inc. History and Purchase of Accurpress 725012 Press Brake

ELIOU was founded in 1970 by Peter Eliou, an experienced iron worker.  In 1971

he purchased a used press brake which was operated solely by a foot pedal, and other used, larger

size metal forming machinery, including a shear (for cutting metal) and punch presses.  In or

about 1971 Peter Eliou's brother, Andonis (Anthony) Eliou,  also an experienced steel worker,

went to work for ELIOU, which fabricated metal gates, windows, doors and stairways.  For the

next nineteen years Anthony Eliou, exclusively, operated the old (used) press brake which was

used primarily to bend quarter-inch thick steel for stairs.  The bending process did not require the

operator to put his hand very close to the "point of operation," the point where the ram came into

contact with the metal to be bent, at any time.

In or about 1989 Eliou felt that it needed to replace the old press brake with an up-

to-date, new machine.  On occasion, salesmen for a variety of machinery dealers stopped by at

ELIOU, and in 1989 Peter Eliou met with one of them, at ELIOU, regarding a new press brake.

The salesman had catalogs and showed Peter Eliou different machines. The salesperson showed

him papers which included an "Accurpress 725012" photograph and a document entitled

"Optional".  The salesman went through the items listed in the "Optional" document with respect

to the Accurpress 725012 and told Peter Eliou what each option was.  The 14 options listed on

-3-

the "Optional" page include a "Safety Light Curtain". Peter Eliou decided to buy the Accurpress 725012 and the options ELIOU wanted to buy with it, Power Operated Backgauge, Power Eccentric, High Speed Option and Tonnage Control. ELIOU elected not to purchase the Safety Light Curtain.

The Accurpress 725012 Press Brake

The Accurpress 725012 is hydraulically powered and can bend up to ¼ inch thick steel. The controls for operating the press brake's ram are in a "Remote Operator's Control Station" (hereinafter the Control Station) which contains electrical controls for operation. The controls include a "stop" button on top of the Control Station; a Hand/Foot Selector Switch (key operated); Dual Palm Buttons; and a 3-Position Foot Switch. When the Hand/Foot Selector Switch is in the "Hand" mode, the Palm Buttons operate the ram. In the "Hand" mode, both of the operator's hands must be simultaneously on the Palm Buttons. When the Hand/Foot Selector Switch is in the "Foot" mode the Foot Switch operates the ram. In the "Foot" mode the operator's hands are free. The Control Station is movable and there is a handle at its top. It is connected to the press by a cord.

HALKIN followed ANSI standards, in particular ANSI B-11.3, for the design of the press brake. The ability to move the control station a safe distance from the press is a design characteristic that provides safety when the "Foot" mode is used in accordance with OSHA[1]. Additional "safeguards" for the press brake are light curtain (optional); palm buttons on the ram (optional); the standard palm buttons on the Control Station; the stop switch (button) on the

---

1   Occupational Safety and Health Administration.

-4-

Control Station; and the safety features built into the foot switch (the toe flap and kick plate). The toe flap must be lifted by the operator's toe. Once the toe is under the flap, the toe must make contact with the kick plate before the toe switch (pedal) will operate, causing the ram to cycle. The design of the subject press brake complied with all standards applicable to it at the time of manufacture.

In relevant part, three warning decals, two triangular yellow and black pictorial and one rectangular, written, were placed on the front of the press brake at the time of manufacture. The written warning states, among other things, as follows:

"NEVER place any part of your body within the die area."

Use of the Accurpress Press Brake at ELIOU

ELIOU bought the Accurpress 725012 to manufacture stairs. From the time it was delivered to ELIOU in 1990, Anthony Eliou operated the press brake for seven years without a problem. He never operated the press brake using the "Hand" mode. Anthony Eliou moved the control station as needed when he operated the press brake. The piece of metal inserted into the bed of the press brake for bending rested on a flat surface and did not have to be held in place by the operator's hands during the bending process. Aside from bending metal for stairs, metal for "concrete forms" was bent at ELIOU. The bending process for concrete forms was the same as for stairs. There was no reason for the press operator to have his hands near the point of operation.

Anthony Eliou never requested that a guard be put on the Accurpress 725012 because it was not needed and would interfere with the operator's vision of the job to be done.

-5-

He felt that, based upon his experience with the Accurpress 725012, the hand buttons were unnecessary.  An advantage to operating the press brake in the "Foot" mode is that once the ram starts bending the metal stair, the operator can hold the <u>front</u> of the stair to stabilize it while the ram <u>ascends</u>.  Doing so does not involve bringing the hands close to the point of operation.

Arben Mustafa's Hiring and Employment at ELIOU

   Starting on June 1, 1998 at ELIOU, Mr. Mustafa was taught how to operate the press brake by Frederick Bezler, an experienced press brake operator.  Mr. Mustafa watched Frederick Bezler operate the press brake in "Foot" mode and understood how to do it.  In "Foot" mode the foot is inserted into the pedal all the way. Stepping down on it, makes a cycle (the ram descends and ascends).  To make another cycle, you must take your foot off the pedal, remove it and then put your foot back in.  Bezler taught Mr. Mustafa to take his foot out of the pedal housing after each cycle.

   Bezler testified that he showed Mr. Mustafa the operation of the red stop button on the control station.  Pushing down the red button on the control station stops the press and prevents the ram from coming down, even if the operator's foot is on the pedal.

   Mr. Mustafa knew that if his hand was in the point of operation the ram could come down on his hand, and that his hand should not be in the area where the die (ram) comes down.  Mr. Mustafa testified that he did not recall seeing the yellow and black triangle pictorial decal on the press and that he had not paid attention to it.

   Mr. Mustafa knew that the Control Station could be moved.  On June 1, or June 2, 1998 Mr. Mustafa bent 35 or 40 steps.  Each step started out flat and was bent three or four times

-6-

resulting in over one hundred fifty pedal activations and ram descents.  When Mr. Mustafa put

his foot on the pedal, he watched the ram come down.  He testified that after each bend was

done, he took his foot off and out of the pedal, as he saw Bezler do it.  No part of any task Mr.

Mustafa was doing on the press brake required him to put his hands in the point of operation.  On

June 1 or June 2, 1998 the key for the hand/foot selector switch was in the switch on the Control

Station.

The Day of the Accident–June 3, 1998

On the morning of June 3, 1998 there was a directive to change the work  and

Bezler made the necessary adjustment to the press brake.  The new metal to be bent was for pour

stops, about four or five feet long, and about five or six inches wide.  Bezler bent two or three

pieces while Mr. Mustafa watched.  After each piece was bent, Bezler removed it and walked it

over to where it was placed.

The accident occurred on the first of these pour stops that Mr. Mustafa did

himself.  He put the piece into the press brake without difficulty, removed his hands, put them

next to his body, and used his right foot to make the ram descend, bending the metal.  After the

ram bent the metal and was going up, the metal was stuck to it.  Mr. Mustafa became confused

and reached with both arms to pull the pour stop off the ram, but it fell before he reached it.  The

pour stop fell into the machine, less than one foot behind the ram, in a horizontal position, and

Mr. Mustafa instinctively reached in behind it.  At the time Mr. Mustafa had not removed his

foot from the pedal housing and he caused the ram to descend upon his arms.

Mr. Mustafa testified that he knew that if something unusual or unexpected happened, he was supposed to turn off the machine.

Defect Claims – Plaintiff's Expert's Design Defect Opinions

Plaintiff's expert, Neal A. Growney P.E. issued a report with respect to this matter, dated June 3, 2005, and was deposed on September 15, 2005.  Mr. Growney testified that, in essence, the design of the press brake is defective because the designer provided for the utilization of the foot pedal actuating mechanism without designing into the press the necessary safeguards to protect an operator from injury.  In other words "it provides the means to bypass the two-hand control but that needs a corresponding component on the press which is the safeguard device.  They go hand and [sic] hand".  Among the "guards or devices" listed by Mr. Growney is a light curtain.

Mr. Growney testified that he was aware that HALKIN offered the light curtain option to ELIOU and that ELIOU elected not to purchase it.

Mr. Growney conceded that Mr. Mustafa did not have to hold the piece of metal he was bending at the time of the accident and that if the Control Station were put several feet away from the machine Mr. Mustafa could not have been injured (whether he did anything inadvertently or not).  Mr. Growney conceded that the Control Station could be placed a safe distance from the press brake and that doing so would provide a means of keeping the operator's hands out of the point of operation if there were an inadvertent act of operation.

Mr. Growney testified that since Mr. Mustafa did not have to hold the metal piece to be bent, the Hand/Foot selector could have been set on the "Hand" mode.

-8-

Mr. Growney testified that if Mr. Mustafa had removed his foot from the pedal after making the bend at the time of the accident he would not have been injured.

Mr. Growney also testified that if one is going to reach through the point of operation he should certainly turn the power off, "if you are cognizant of what you are doing".

Plaintiff's Expert's Opinions on Warnings

Mr. Growney acknowledged that Mr. Mustafa was aware that if his hand was in the point of operation and the ram came down he could be injured; and that at the time of the accident Mr. Mustafa instinctively put his hands into the point of operation.

As to the warning decals on the press brake, Mr. Growney testified that he had no objection to the triangular pictorial warning decals.  With respect to the written warning decal, Mr. Growney testified that the hazard requiring a warning is "having a part of your body caught in the point of operation" but that a warning to never place any part of your body within the die area is insufficient because it does not cover unintentional, inadvertent, placement.  He also testified that the warnings on the decal were for ELIOU and for Mr. Mustafa, but since Mr. Mustafa could not read them ELIOU was obligated to communicate them to Mr. Mustafa.

The Basis for Plaintiff's Expert's Opinions

Mr. Growney testified that in arriving at his opinions he takes into account ANSI Standards, OSHA Rules and Regulations and Labor standards.  In addition, he takes into account industry practice, which consists of the "general rule" of engineers to protect safety, a rule similar to a doctor saying he was going to do what he can to help the patient.  Mr. Growney testified that

-9-

this general rule is the "hierarchy of safety controls" discussed by the National Safety Counsel. It is an "overall engineering philosophy".

With respect to ANSI standards, Mr. Growney relied only upon ANSI B15.1 in his report, but testified that ANSI B15.1 governs guarding of mechanical power transmission apparatus, which is distinct from point-of-operation guarding. Mr. Growney testified that in this case, there is no issue as to power transmission guarding relevant to his opinion, only point-of-operation guarding.

In Mr. Growney's view, even if a press brake is in compliance with the applicable ANSI standards, it could still be unsafe, because the ANSI standards are a "minimum requirement of what you need to do in attempt to make a machine safe". Mr. Growney testified that ANSI B11.3 1982 ( the applicable ANSI standard) is authoritative and that he "consulted" it in forming his opinion. However, Mr. Growney's report is barren of any reference to ANSI B11.3. Neither Mr. Growney's report nor his testimony includes an opinion that the subject press brake was not in compliance with ANSI B11.3 1982.

Mr. Growney testified that the ultimate question of whether a press brake is defective is not up to individual engineers, "it's like common knowledge". "It's a custom and practice". To Mr. Growney industry practice – "what the industry is doing" – can be determined from industry publications and periodicals and industry groups which he considers informative, as opposed to authoritative, in arriving at his opinions. While he also stated that ANSI standards reflect industry practice, he testified that industry publications, periodicals and industry groups

-10-

are "not the final authority." Rather, the final authority is "whether your guy gets his hands crushed, that's the final authority".

Mr. Growney's report quotes the National Safety Council, Accident Prevention Manual (1985) with respect to safeguarding in general. Mr. Growney testified that according to the National Safety Council the issue of safeguarding is a function of, among other things, the feeding and removal of piece parts at the point of operation – which the manufacturer is <u>not</u> involved in. Mr. Growney testified that the National Safety Counsel addresses press brakes as a particular machine, but Mr. Growney did not cite those references in his report.

Mr. Growney's report states that power presses and press brake functions are virtually the same and can utilize the same safeguarding technologies. He testified, however, that manufacturers of guards distinguish between power presses and press brakes.

<u>The Basis for HALKIN's Motion</u>

It is respectfully submitted, without being exhaustive, that the foregoing establishes that:

     a. Mr. Mustafa was fully aware of the fact that there was no light curtain on the press brake; he knew that he did not have to reach into the point of operation for any reason; he knew that a machine should be "off" before putting his hand into it; his conduct was a gross overreaction to an occurrence that did not require immediate attention.

     b. The press brake had a number of safety features which, if utilized by plaintiff or ELIOU, would have prevented the injuries. The safety features include: safe distance (having the movable control station more than arms length from the point of operation); using the "Hand" mode where the bending process did not require the operator to use his hands while the

-11-

bending was done; and removing the foot from the foot switch housing after bending.

c.  ELIOU was a thoroughly experienced user of press brakes and a thoroughly knowledgeable buyer of the subject press brake. The press brake complied with all standards applicable to it. ELIOU elected not to buy the light curtain option and was in the best position to make that judgment. The press brake was not unreasonably dangerous without the light curtain.

d.  Mr. Mustafa was fully aware of the danger posed by the point of operation; the danger was open and obvious; there were adequate pictorial and written warnings on the press brake; Mr. Mustafa's instinctive conduct negates a failure to warn claim.

e.  Mr. Growney's testimony is unreliable because it is based on generalities rather than specifics; ignores what is unfavorable to plaintiff; is lacking in scientific rigor; indicates a predisposition to the view that the press brake was the cause of the accident.

For the foregoing reasons and those in the Argument section which follows,

HALKIN's motion should be granted.

## ARGUMENT

### POINT I

**PLAINTIFF WAS AWARE OF THE DANGER POSED BY THE POINT OF OPERATION.  HE CANNOT DEMON-STRATE THAT HIS INJURY COULD NOT HAVE BEEN AVERTED BY EXERCISE OF REASONABLE CARE**

Plaintiff has the burden of offering

Sufficient evidence upon which a reasonable jury could base the conclusion that (i) a product was defective in that is was not reasonably safe for use in the manner intended; (ii) a products defect was a 'substantial factor' in causing the plaintiffs injury or damages, (iii) at the time of the occurrence of the injury the product was being used for the purpose and is the manner normally

-12-

> intended; (iv) the defect could not have been discovered by the
> plaintiff and its danger perceived by the exercise of reasonable
> care; and (v) the plaintiffs injury or damage could not have been
> averted by the exercise of reasonable care (citations omitted) (<u>Sita
> v. Danak Medical Inc.</u> 43 F. Supp 2d 245, 252 [EDNY 1999])

(see also Marshall v. Sheldahl, Inc., 150 F.Supp.2d 400 [NDNY 2001]).

In <u>Marshall</u>, plaintiff was operating a machine at her place of employment. After stopping it in order to splice a new roll of material she restarted it and noticed that the material began to tear apart. Without turning the machine off, she walked back to its rear and attempted to reattach the moving material as it entered the machine by grasping hold of it, and injured her hand when it was drawn between the machine's rollers. Plaintiff claimed defective design for lack of a guard. The manufacturer of the machine moved for summary judgment on the ground that the machine's design was not defective and that the alleged defects were open and obvious. After describing the opinions of the respective experts the court found that plaintiff's actions alone rendered her defective design claims deficient, because, assuming <u>arguendo</u> that the machine "was defective because it failed to contain a hand guard... plaintiff still under <u>Fane v. Zimmer, Inc.</u> (927 F.2d 124, 128 [2d Cir. 1997]) and its progeny, had a duty to both discover and avoid the injury in the exercise of reasonable and ordinary care" (150 F.Supp. at 404).

Based upon an examination of the photographic and documentary evidence describing the machine, the court held that the dangers of the relevant portion of the machine were so open and obvious that no reasonable person would attempt to reach into it without first shutting the machine off (150 F Suppa at 404). The court in <u>Marshall</u> further cited <u>Altamonte v. Batenfield of America</u> (1998 U.S. Dist. LEXIS 232 84 [EDNT 1998]) quoting the following language:

-13-

> Plaintiff does not claim or demonstrate that it was part of the
> normal and expected activities of a user of the Sheldahl machine to
> place their hands in or near the moving belts. While plaintiff is
> correct in asserting that "reasonableness" is generally a jury
> question, he neglects to consider the preliminary inquiry.
> [Plaintiff's] actions were not reasonably foreseeable, such that
> these events fell within the probability of risks that would lead to
> the eventual injury and loss. See *Tucci v. Bossert*, 53 A.D.2d 291,
> 293, 385 N.Y.S.2d 328 (2d Dep't 1976). If [Plaintiff] had
> exercised even the slightest degree of care, such as turning off the
> power to the machine, he could have avoided his injury. (150
> F.Supp.2d at 404).

Similarly, in this case, plaintiff does not claim or demonstrate that it was part of

the normal and expected activities of a user of the subject press brake to place his hands in or

near the point of operation. Mr. Mustafa specifically testified that he did not have to do so. He

also testified that he had been taught, and knew, that his foot should be removed from the pedal

housing after the ram bent the metal. He also knew that a machine should be off before putting

his hand into it. The combination of <u>confusion,</u> the <u>instinctive reach in</u> and the <u>failure to remove</u>

the foot from the pedal caused the accident. Additionally, Mr. Mustafa's conduct was a gross

overreaction to an occurrence that did not require immediate attention. HALKIN provided a

movable Control Station, a "Hand" mode, a pedal with two safety features and a stop button on

the top of the Control Station where plaintiff was standing. If plaintiff had exercised even the

slightest degree of care, such as keeping a safe distance, using the "Hand" mode, removing his

foot from the pedal, or pushing the stop button, he could have avoided his injury.

Under circumstances where the event created no emergency and where plaintiff

was fully aware of the danger, plaintiff's failure to avoid the injury in the exercise of reasonable

-14-

and ordinary care warrants the court to award summary judgment to HALKIN on plaintiff's design defect claims.

## POINT II

### THE DESIGN OF THE PRESS BRAKE WAS NOT DEFECTIVE BECAUSE HALKIN OFFERED ELIOU A LIGHT CURTAIN AS OPTIONAL EQUIPMENT AND ELIOU ELECTED NOT TO BUY IT

A defectively designed product is a product which at the time it leaves the seller's hands is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use (Scarangella v. Thomas Built Buses, Inc., 93 NY2d 655 [1999]).  Scarangella held that a manufacturer will not be found liable for selling a product without an optional safety feature:

> Where the evidence and reasonable inferences therefrom show that:  (1) the buyer is thoroughly knowledgeable regarding the product and its use and is actually aware that the safety feature is available; (2) there exist normal circumstances of use in which the product is not unreasonably dangerous without the optional equipment; and (3) the buyer is in a position, given the range of uses of the product, to balance the benefits and the risks of not having the safety device in the specifically contemplated circumstances of the buyer's use of the product.

(emphasis in original, 93 NY2d at 661).

( see also DiMaria v. Komatsu Forklift U.S.A., Inc., 2003 U.S. Dist. LEXIS 10550 [EDNY 2003]; Gian v. Cincinnati Incorp. 17 AD3d 1014 [4th Dept. 2005]; Cordani v. Thompson & Johnston Equipment Co., Inc., 16 AD3d 1002 [3rd Dept. 2005]; Warlikowski v. Burger King Corp., 9 AD3d 360 [2nd Dept. 2004]).

-15-

In Scarangella the Court of Appeals applied the three factors as follows:  factor
(1)- by looking at how long the buyer was in business, using the product ( a school bus), and
whether it was aware of the danger (blind spot when a bus was operated in reverse) and whether
the optional safety feature (back up alarm) was available at the time of purchase (93 NY2d at
661); factor (2)- by  looking at the actual circumstances of the operation of the product by the
buyer to see if the risk of harm from the absence of the optional safety feature was "substantial".
 In this regard the court noted that the employees of the buyer were given particular instruction
regarding the operation of the product and that they were fully aware of the hazard (93 NY2d at
661-662); and factor (3)- by looking at whether the buyer was in a position to balance the
benefits and the dangers of not having the safety device, given the contemplated uses of the
product (93 NY2d at 662).

The DiMaria supra, the product was a forklift, an industrial product, and the
optional safety feature was a back up alarm.  In evaluating <u>Scarangella</u> factor no. 2 the court
looked to the applicable standards for forklifts and noted that the optional safety feature was not
mandated by any Federal or State law rule or regulation (2003 U.S. dist. LEXIS 10550 at p. 11).
(see also <u>Gian</u> supra at 17 AD3d at 1016).  In <u>Cordani</u> the court noted, with respect to
Scarangella factor no. 1, that a brochure entitled "Safety Equipment" described in intimate detail
the various safety equipment options available and that the Safety Equipment brochure was
among the buyer's purchase documents for the product (16 AD3d at 1005).  As to <u>Scarangella</u>
factor no. 2, the court stated that the product "which met all national and industry standards, was
safe for its intended use when properly maintained and inspected.  Indeed no law or regulation
mandated [the optional safety device on the product]" (16 AD3d at 1006).  Finally as to

-16-

Scarangella factor no. 3, the court noted that the buyer had utilized the product for over 20 years prior to plaintiff's accident, knew the conditions under which it would be used in its facility and how its operators would be trained (16 AD3d at 1006).

In this case, with respect to Scarangella factor no.1, it is submitted that the evidence and reasonable inferences therefrom show that ELIOU is a thoroughly knowledgeable buyer regarding the Accurpress 725012 press brake, and its use, and was aware of the light curtain offered as an option by HALKIN; (2) that there exist normal circumstances of use in which the Accurpress 725012 press brake is not unreasonably dangerous without the light curtain (such as "Hand" mode);and (3) that ELIOU was in a position given the range of uses of the press brake to balance the benefits and risks of not having the light curtain in its specifically contemplated use of the press brake.

The relevant facts in this case are that ELIOU owned a press brake for almost 20 years before it purchased the Accurpress 725012 in 1990. The "old" press brake was operated by a foot pedal exclusively. Bending steel on a press brake was fundamental to ELIOU's operation in fabricating its products, primarily stairs. Before purchasing the Accurpress 725012, ELIOU was aware of the optional light curtain – and all of the other available optional safety features. ELIOU produced its purchase papers, which include the Options brochure for the Accurpress 725012. Peter Eliou testified that all the options listed in the brochure were fully explained by the salesperson. The sales invoice indicates that certain options were selected and others (including the light curtain) were not.

-17-

As to Scarangella factor no. 2, the facts are that the press brake met all applicable national and industry standards.  The Hand/Foot selector control is a permitted design.  No law or regulation mandates the use of a light curtain.  Moreover, the facts clearly demonstrate that safe distance alone (between the press and the movable control station) was sufficient as a safety feature with respect to the point of operation hazard.  Additionally, the option to turn the selector key and use the "Hand" mode was always available and there is no dispute that the operator of the subject press brake was <u>never</u> required to have his hands or any part of his body anywhere near the point of operation when the pedal was applied in operating the press brake.

As to Scarangella factor no. 3, the press brake was used at ELIOU primarily for making stairs and occasionally for concrete pour stops.  Both involve the same operation and neither ever required the operator to put his hand near or into the point of operation.  This was well known to Mr. Mustafa.  ELIOU was bending steel for steps and pour stops on a pedal-operated press brake, without a light curtain, for some 20 years before ordering the Accurpress 725012.  The employees who operated the old press brake and the Accurpress 725012 knew of the hazard posed by the point of operation <u>and</u> that bending stairs and pour stops did not <u>require</u> anyone's hands being near the point of operation.  In the bending of steps there is an advantage to having the hands free.

Here, as in Scarangella, the purchaser, ELIOU, was the party in the best position to exercise an intelligent judgment to make the trade-off between cost and function of the light curtain.  This "position" of an employer is exactly what OSHA mandates, because the employer is responsible under OSHA for training, enforcement, safeguarding machinery and supervision.

-18-

It is respectfully submitted that ELIOU ( and not HALKIN) was in a position to assess the efficacy of alternative safety measures in its operational rules and training of press brake operators.  Having offered the light curtain to ELIOU, HALKIN's design of the press brake was not defective for failure to include a light curtain, as a matter of law.  The Accurpress 725012 sold by HALKIN to ELIOU was in the condition contemplated by ELIOU and was not unreasonably dangerous for its intended use.  It had numerous safety features which, if used, would have prevented the accident.

## POINT III

### THE PICTORIAL AND WRITTEN WARNINGS PROVIDED BY HALKIN WERE ADEQUATE; THE DANGER WAS OPEN AND OBVIOUS AND PLAINTIFF WAS FULLY AWARE OF IT

In New York a manufacturer has a duty to warn against: (1) latent dangers resulting from foreseeable uses of its product about which it knew or should have known; and (2) dangers of reasonably foreseeable unintended uses of a product (Clarke v. L.R. Systems, 219 F. Supp. 2d 323, 329 [EDNY 2002] citing Liriano v. Hobart Corp., 92 NY2d 232, 237 [1998]; see also Rastelli v. Goodyear Tire co., 79 NY2d 289, 297 [1992]).  However, a court may dismiss a failure to warn claim as a matter of law if: (1) the defendant had no duty to warn because the hazard was patently dangerous or posed an open and obvious risk or (2) the plaintiff cannot prove causation because "the injured party was fully aware of the hazard through general knowledge, observation or common sense" (Clarke v. LR Systems, supra. Gian v. Cincinnati Inc., 17 AD3d 1014, 1016 [4th Dept 2005]; Warlikowski v. Burger King Corp. 5AD3d 378 [2nd Dept 2004])

In this case the undisputed facts establish that HALKIN sold the press with three warning decals on it and that the three decals were on the press during plaintiff's employment at ELIOU. Two of the three decals are triangular and contain a pictorial warning showing an object coming across a hand, and the third decal is rectangular and contains several written warnings including one which states "never place any part of your body within the die area." Plaintiff's expert testified that he had no objection to the triangular pictorial warning decals. As to the written warning plaintiff's expert testified that the hazard requiring a warning is "having a part of your body caught in the point of operation." It is submitted that the written warning on the rectangular decal "never place any part of your body in the die area" satisfies this requirement. Finally, plaintiff cannot prove that the absence of any warning caused his injury because he testified that his hands did not have to come near the point of operation to perform the bending task, and that he became confused and instinctively reached into the point of operation, while his foot was inside the pedal housing. Clearly, a warning on the press brake would have made no difference to plaintiff who acted instinctively, contrary to his training and knowledge, and who could not read English in any event. In essence, the absence of the warning plaintiff claims was necessary could not possibly be the proximate cause of his accident (see e.g. Dias v. Marriott International, 251 AD2d 367 368 [2 nd Dept. 1998] (see also Marmol v. Biro Manufacturing Co., 1997 U.S. Dist. LEXIS 21669 [EDNY 1997]; Marshall v. Sheldahl, Inc., 150 F. Supp. 2d 400 [NDNY 2001].

In any event, since the danger of the point of operation was patent and posed an open and obvious risk, HALKIN had no duty to warn plaintiff of it. The facts are that the subject press brake is an industrial metal bending machine and plaintiff testified that he watched the ram

descend and bend quarter inch thick steel some one hundred and fifty times before his accident. The danger to a body part in the point of operation is patent.

Additionally, plaintiff was fully aware of the hazard. He testified that after seeing the die (ram) come down (at ELIOU) he knew that if his hand was in the point of operation, it could come down on it. He testified further that he was specifically aware of the hazard the day before the accident. Apart from plaintiff's testimony above, he testified that he had over 20 years of experience in working with metal forming machinery before coming to ELIOU and that he was fully aware of the hazard of moving machinery and the need to keep body parts away from moving machinery. He also testified that if he were going to put his hand onto a machine for any purpose, he would first have to make sure the machine was off before doing so.

## POINT IV

### MR. GROWNEY'S TESTIMONY IS UNRELIABLE AND SHOULD BE PRECLUDED

Under Federal Rule of Evidence 702 the trial court acts as a gatekeeper with respect to expert testimony (see F.R.E. 702; KumhoTire Co. v. Carmichael, 526 U.S. 137, 141, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 [1998]). The goal of the Court's gate keeping task is to insure that the expert's testimony "both rests on a reliable foundation and is relevant to the task at hand "(Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597, 113 S.Ct. 2786, 2799, 125 L.Ed.2d 469 [1993]). In Clarke v. LR Systems (215 F.Supp.2d 323 [EDNY 2002]) the court noted that in assessing the reliability of a proffered expert's testimony, the court's inquiry under Daubert focuses on the principles and methodology used to generate the conclusions.

-21-

In Barban v. Rheem Textile System Inc. (2005 U.S. Dist. LEXIS 5996 [EDNY 2005]), a design defect machine case, the court found that the proffered testimony of an engineering expert lacked "the barest of scientific rigor which is required of all experts in Federal court." Among other things, the expert reached his conclusions, notwithstanding his acknowledgment that the machine met all recognized written standards and regulations, which he rejected as being incompatible with ensuring the absolute 'safety' of operations of the machine. The court noted that the expert testified that "if a machine injures somebody, it is the defect of the machine, not of the operator" contradicting "the well established principle in tort law that a manufacturer is not an insurer against injury, nor must the product be accident proof" (citation omitted). "That startling view also drives the Court to conclude, that without anything more and based only on the fact that plaintiff was injured [the expert] is predisposed to the view that the machine was the cause. It was precisely that pretense of expertise, characterized as "junk science", at which Daubert was aimed." (2005 US Dist LEXIS 5996 p 18-19)  The expert additionally rendered an opinion about the adequacy of warnings without conducting any studies regarding what warnings, if any, were placed on similar machines at the time the one in question was manufactured.  The expert disregarded testimony not favorable to his conclusions and undertook no studies to determine whether and how his proposed alternative design would impact the machine.

In this case plaintiff's expert conceded, among other things, that Mr. Mustafa did not have to hold the piece of metal he was bending at the time of the accident; that the Hand/Foot selector could therefore have been set in the "Hand" mode; that if the control station were placed several feet away from the point of operation, Mr. Mustafa could not have been injured; that if

Mr. Mustafa had removed his foot from the pedal after making the bend at the time of the accident as he was trained, he would not have been injured; and that he had no objection to the triangular pictorial warning decals. None of the foregoing concessions are mentioned in Mr. Growney's report.

Mr. Growney testified that he considers ANSI standards authoritative and that ANSI B11.3 1982 is applicable to press brakes. However, he cited an irrelevant ANSI standard in his report (ANSI B15.1) and did not cite ANSI B11.3 therein. Similarly, with respect to the National Safety Counsel Accident Prevention Manual, Mr. Growney testified that it is authoritative and that it contains a section on press brakes. However, he only cited general provisions from the accident Prevention Manual and not the specific press brake section. It is respectfully submitted that the inference to be drawn from the foregoing is that the design of the press brake conformed with the requirements of ANSI and the National Safety Counsel, and that Mr. Growney refused to acknowledge this because it is unfavorable to plaintiff.

Mr. Growney testified that if a press brake is in compliance with the ANSI standards applicable to it, the press brake could still be unsafe because the ANSI standards are a minimum requirement of what you need to do in attempt to make a machine safe.

After excising the non- applicable standards, rules, regulations etc. and the non-authoritative bases, for Mr. Growney's opinions, the end result is purely subjective and conclusory. The opinions lack the barest of scientific vigor. As Mr. Growney testified, to him the final authority is "whether your guy gets his hand crushed." This reflects that he is predisposed to the view that the press brake was the cause of the accident; that the press brake

-23-

must be accident proof and that the manufacturer is an insurer against injury.  The testimony herein is similar to that in <u>Barban</u>.  It is unreliable and should be precluded.

## CONCLUSION

Based upon the foregoing and the Affidavit in Support with exhibits, HALKIN's motion for Summary Judgment should be granted.

Dated: New York, New York
         February 27, 2006

Respectfully submitted,

HERZFELD & RUBIN, P.C.
Attorneys for Defendant/Third Party Plaintiff
Halkin Tool, Ltd

By:

Isaac Szpilzinger (IS-1844)
40 Wall Street
New York, New York 10005
(212) 471-8500

-24-