UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------- x
ARBEN MUSTAFA,


    Plaintiff,                                    <u>MEMORANDUM AND ORDER</u>


     - against -                                 00-CV-4851 (DGT)

HALKIN TOOL, LTD.,


    Defendant.


-------------------------------------------------
HALKIN TOOL, LTD.,                                   x


    Third-Party Plaintiff,


     - against -

ELIOU STEEL FABRICATION, INC.,


    Third-Party Defendant.


                                 x
-------------------------------------------------
TRAGER, J.

    Plaintiff Arben Mustafa ("Mustafa") brings this diversity
action alleging products liability claims against defendant
Halkin Tool, Ltd. ("Halkin") for personal injuries he suffered in
a workplace accident while operating a press brake manufactured

by Halkin[1] on June 3, 1998.

Mustafa commenced this action against Halkin on June 28, 2000, asserting negligence, strict products liability and breach of warranty.[2] Halkin impleaded Mustafa's employer, Eliou Steel Fabrication, Inc. ("Eliou"), as a third-party defendant, seeking contribution and indemnity pursuant to Rule 14 of the Federal Rules of Civil Procedure. Halkin moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on February 27, 2006. The following facts are undisputed, unless otherwise noted.

## Background

### (1)

### Arben Mustafa

Mustafa was born in Tirana, Albania on June 29, 1956. March 7, 2002 Deposition of Arben B. Mustafa ("First Mustafa Dep.") at 7:10-16. In 1972, Mustafa began a fourteen-year period of employment as a machinist in a metal forming factory in Albania. Defendant's Rule 56.1 Statement of Material Facts

---

[1] The press brake at issue was manufactured by Halkins' predecessor, Accurpress Manufacturing, Ltd. ("Accurpress") in British Columbia, Canada. Expert Report of William B. Eaton ("Eaton Report") at 2; Affidavit of Simcha D. Schonfeld in Opposition of Motion ("Schonfeld Aff.") ¶ 45.

[2] Mustafa conceded that the breach of warranty cause of action is time barred.

("Def.'s 56.1 Stmt") ¶ 1.  At the factory in Albania, he operated various metal working machinery, including lathes, milling machines and drilling machines.  Def.'s 56.1 Stmt ¶ 2.  In 1986, Mustafa was promoted to manager of the factory, and worked in that capacity until 1993.  Affidavit of Isaac Szpilzinger in Support of Motion ("Szpilzinger Aff.") ¶ 11.

In 1996, Mustafa immigrated to the United States from Albania at the age of 40.  First Mustafa Dep. at 9:9-11.  After coming to the United States, Mustafa worked as a machinist in a machine shop repairing broken machine parts, as a lathe operator and as a machine mechanic for envelope machinery.  Szpilzinger Aff. ¶ 15.

In late May of 1998, Mustafa interviewed for a position at Eliou.  Szpilzinger ¶ 30.  Mustafa did not understand English at that time, and the interview was conducted through a translator.  Id.  Mustafa was hired as a laborer to assist in the cutting and bending of metal sheets.  First Mustafa Dep. at 86:1-25.  He commenced his employment with Eliou on June 1, 1998.  Id.  On the morning of June 3, 1998, Mustafa was severely injured while operating a press brake at Eliou.

## (2)

### The Accurpress 725012 Press Brake

Mustafa was injured while operating the Accurpress 725012

press brake ("press brake"), a hydraulically-powered press brake used to bend sheets of metal up to one-fourth of an inch thick. Schonfeld Aff. ¶ ¶ 45-46; Szpilzinger Aff. ¶ 21.

To bend a piece of metal, the operator positions the metal in the press brake and then activates the ram. A sharp metal component referred to as a "punch" is mounted to the ram and descends vertically on top of a second metal component, called a "die," which is mounted in the press brake's bed. Schonfeld Aff. ¶ 47. The metal is bent when the upper die forces the metal against the lower die. The area in the machine where the metal is bent is called the "point of operation." Id. After the metal is bent, the ram immediately raises itself back up. Id. ¶ 39.

The controls for operating the press brake's ram are located on a "Remote Operator's Control Station" ("control station"). Szpilzinger Aff. ¶ 21, Ex. C; Schonfeld Aff., Ex. K. The control station is separate from the press brake itself; it is moveable and is connected to the press brake by an electrical cord. Szpilzinger Aff. ¶ 22. The controls located on the control station are 1) a "start" button; 2) a "stop" button; 3) a hand/foot selector switch, operable by key only; 4) two dual "palm buttons," located one on each side of the control panel; and 5) a foot switch, located in the bottom center. Szpilzinger Aff. ¶ 21, Ex. C; Schonfeld Aff., Ex. K.

The ram's descent can be activated by either hand control

buttons (also called "dual palm buttons") or by a foot pedal. Schonfeld Aff. ¶ 48; Szpilzinger Aff. ¶ 22. The control can be changed from "hand mode" to "foot mode" by placing a key in the hand/foot selector switch and turning the key to the desired mode. Report of Plaintiff's Expert Neal A. Growney ("Growney Report") ¶ 7.22.

If the hand/foot selector switch is in "hand mode," in order for the ram to descend, the operator must push both buttons on the control station simultaneously. Schonfeld Aff. ¶ 49; Szpilzinger Aff. ¶ 22. The two-hand actuation, as well as the placement of these buttons on the control station, ensures that the operator's hands cannot reach the point of operation before the ram descends. Growney Report ¶ 7.15.

If the hand/foot selector switch is in the "foot mode," in order for the ram to descend, the operator must press the pedal with his or her foot. Schonfeld Aff. ¶ 50; Szpilzinger Aff. ¶ 22. Foot mode does not require the use of the operator's hands to activate the ram; it allows the operator's hands to be near the point of operation while his or her foot activates the ram. Schonfeld Aff. ¶ 50; Szpilzinger Aff. ¶ 22; Growney Report ¶ 7.6.

The foot control is equipped with two "anti-trip" provisions: 1) an entry gate; and 2) a pedal toe-lock/release mechanism. Eaton Report at 3. The entry gate blocks unintended access to the foot switch pedal by requiring the gate to be

raised before the foot can enter and access the pedal.  Id.
at 3.  The toe-lock/release mechanism requires "forward foot
insertion to the frontal aspect of the pedal to release the anti-
trip mechanism in order to allow downward pedal travel in
response to foot actuation."  Id.

When the equipment was inspected on July 8, 1998 and on
December 7, 2001, the entry gate was functional but the toe-
lock/release mechanism was inoperative.  Id. at 3-4.
Defendant's expert, William B. Eaton ("Eaton"), testified that
the operating condition of the foot switch observed on July 8,
1998 may have been the functional state of that device on the
date of the accident.  Id. at 4.


### (3)

### Eliou and the Purchase and Operation of the Accurpress 725012 Press Brake

Founded in 1970 by Peter Eliou, Eliou is a steel
fabrication shop that produces metal stairways, gates, doors and
other structural steel forms and installs these fabricated items
in the field.  Eaton Report at 5; Szpilzinger Aff. ¶ 16.  From
1971 or 1972 until 1990, Eliou owned and operated another press
brake for stair fabrication operations.  Eaton Report at 5;
Szpilzinger Aff. ¶ 16.  That press brake was operable by foot
pedal only, Eaton Report at 5, and did not have guards at the
point of operation, Deposition of Anthony Eliou ("A. Eliou Dep.")

6

at 27:20-22.  It was primarily used to bend quarter inch-thick steel for stairs.  Def.'s 56.1 Stmt ¶ 11.  Peter Eliou's brother, Anthony, was the only person who used the press brake.  A. Eliou Dep. at 29:23-30:4; Def.'s Mem. in Supp. at 3.

In or about 1989, Peter Eliou and his brother-in-law, Andrew Scopelitis decided to replace the old press brake with an up-to-date press brake that could bend metal for stairs as well as bend metal for "concrete forms."  Deposition of Peter Eliou ("P. Eliou Dep.") at 86:20-87:10, 92:17-19; Deposition of Andrew Scopelitis ("Scopelitis Dep.") at 85:20-89:15; Szpilzinger Aff. ¶ 19.

In 1989, Peter Eliou met with a machinery salesman regarding Eliou's decision to purchase a new press brake.  Def.'s 56.1 Stmt ¶ 13.  The salesman had catalogs and showed Peter Eliou different machines, including a photograph of the Accurpress 725012.  The salesman also showed Peter Eliou a document entitled "Optional," which listed fourteen options available for purchase with the machines.  Def.'s 56.1 Stmt ¶ ¶ 15-16.  The options listed were: 1) power operated backgauge; 2) manually front operated backgauge; 3) support arms for front gauging; 4) angle plates; 5) second footswitch[3]; 6) power eccentric for ram level; 7) hard

_____

[3]  The description of the second footswitch is detailed on the Optional Sheet as follows: "Some users may want a second footswitch so the press will only function when both foot pedals are depressed.  Raising either foot pedal will cause the ram to rise.  For single operator use, a 2-position selector switch on the electrical cabinet allows selection of one or both foot switches."  Szpilzinger Aff. ¶ 5, Ex. C.

ram inserts; 8) palm buttons mounted on ram; 9) increased throat depth; 10) adjustable bending speed; 11) tonnage control; 12) t-slots in bed; 13) machine groove in bed; and 14) safety light curtain.[4]  Szpilzinger Aff., Ex. C.  The salesman went through the items listed in the "Optional" document with respect to the Accurpress 725012 and "told Peter Eliou what each option was." Def.'s 56.1 Stmt ¶ 16.

Peter Eliou decided to buy the Accurpress 725012, serial number 1710, with the following options: 1) power operated backgauge; 6) power eccentric; 11) tonnage control; and high speed hydraulic package.  Def.'s 56.1 Stmt ¶ ¶ 18-19; Szpilzinger Aff. ¶ 20, Ex. B.  Notably, Eliou elected not to purchase the press brake with the safety light curtain.  Szpilzinger Aff., Ex. B.  The press brake was ordered in September 1990 through Walsh Atkinson Co., a machinery dealer in Hicksville, New York. Szpilzinger Aff. ¶ 6.

After the new press brake was delivered, Anthony Eliou operated it exclusively for seven years.  A. Eliou Dep. at 29:23-30:4; Szpilzinger Aff. ¶ 25.  Anthony Eliou testified that he never requested that a guard be put on the press brake because it

---

[4]  The light curtain is described on the Optional Sheet as follows: "This option is available where additional operator safety is required.  In operation, beams of light are projected in front of hazardous areas.  If a worker's hand brakes the "curtain," a signal is sent instantly to the stop circuit of the machine.  Szpilzinger Aff. ¶ 14, Ex. C.

would interfere with the operator's vision.  A. Eliou Dep. at 51:22-52:9.

**(4)**

**The Warning Signs on the Accurpress 725012 Press Brake**

There are three warning signs affixed to the press brake's ram, one written and two pictorial.  Growney Report ¶ ¶ 6.3-6.4, photos D-15, E-19.  The written warning sign reads, "WARNING": "NEVER PLACE ANY PART OF YOUR BODY WITHIN DIE AREA.  NEVER OPERATE THIS MACHINE WITHOUT ADEQUATE SAFEGUARDING.  NEVER OPERATE, INSTALL DIES, OR MAINTAIN THIS MACHINE WITHOUT PROPER INSTRUCTION & WITHOUT FIRST READING & UNDERSTANDING THE OPERATORS OR MACHINE MANUAL."[5]  Growney Report ¶ 6.3, D-15; Eaton Report at 3.

Also affixed to the press brake are also two yellow and black triangular pictorial signs depicting a hand with detached fingers, containing the words, "!WARNING! DO NOT EXTEND FINGERS OR HANDS BEYOND GUARD OR BARRIER."  Growney Report ¶ 6.4, photo D-16.

Following the accident, Eliou placed a "danger" sign, which hung from a metal chain was strung across the rear of the press

---

[5] At the bottom of the sign, in smaller, red font, the sign reads: "IT IS THE EMPLOYER'S RESPONSIBILITY TO IMPLEMENT THE ABOVE AND ALSO TO PROVIDE PROPER DEVICES OR MEANS THAT MAY BE NECESSARY OR REQUIRED FOR ANY PARTICULAR USE, OPERATION SET-UP, OR SERVICE."  Growney Report ¶ 6.3, D-15.

brake.  Growney Report ¶ ¶ 6.10, 7.50.

**(5)**

### Description of the Accident

On June 1 or June 2, 1998, Mustafa reported to work.
Fredrick Bezler ("Bezler") was in charge of teaching Mustafa how
to use the press brake.  Communications between Bezler and
Mustafa were non-verbal, Bezler Dep. at 72:11-15; First Mustafa
Dep. at 92:7, because Mustafa was not conversant in English and
Bezler could not speak Albanian.  First Mustafa Dep. at 92:18-25;
April 1, 2002 Deposition of Mustafa ("Second Mustafa Dep.") at
202:18-23; Bezler Dep at 30:23-31:22; Eaton Report at 4.

Bezler showed Mustafa how to bend pieces by bending pieces
himself.  First Mustafa Dep. at 91:17-92:25.  Bezler operated the
press brake by using the foot pedal, Def.'s 56.1 Stmt ¶ 38, and
taught Mustafa how to operate it by using the foot pedal, Def.'s
56.1 Stmt ¶ 39.[6]  Bezler's demonstration included placing his
hands on the metal piece as it was being bent.[7]  Bezler Dep. at

---

[6] It was Eliou's practice to always operate the press brake
in foot mode.  Bezler Dep. at 28:4-30:22; Growney Report ¶ 7.38.
In fact, Bezler was never taught how to operate the press brake
with the hand control buttons, Bezler Dep. at 28:10-12, and did
not teach Mustafa to use the hand buttons, Bezler Dep. at 82:13-
15.  The key for the Hand/Foot selector switch was in the switch
on the control station on June 1 or June 2, 1998, Def.'s 56.1
Stmt ¶ 54, and it was set to foot mode.

[7] According to Bezler and to plaintiff's expert, it was
standard operating procedure at Eliou for press brake operators

10

68:2-14, 71:2-8, 72:6-15.

Each step started out flat and was bent three or four times. Def.'s 56.1 Stmt ¶ 48. Mustafa bent 35 to 40 steps on the press brake. Def.'s 56.1 Stmt ¶ 47. After each bend was done, Mustafa would take his foot off of the pedal and out of the housing, as he had seen Bezler do. Def.'s 56.1 Stmt ¶ 51.

The accident occurred on June 3, 1998, at approximately 7:30 a.m., on Mustafa's third day of work. Mustafa continued bending the steps he had been working on the previous day. Second Mustafa Dep. at 201:11-202:10. While doing this bending, there was a directive to change work and bend metal for "pour stops".[8] Def.'s 56.1 Stmt ¶ 45; Second Mustafa Dep. at 207:9-15, 209:20-210:3. These pieces were longer, narrower and thinner than those Mustafa had been bending previously. Growney Report ¶ 3.0. Bezler made the necessary adjustments to the machine and demonstrated the bending procedure by bending two or three pour stop pieces while Mustafa watched. Def.'s 56.1 Stmt ¶ 56. After each piece was bent, Bezler removed it and "walked it over to where it was placed." Def.'s 56.1 Stmt ¶ 57. The accident occurred on the first of the pour stops that Mustafa bent by

_____

to grasp the work pieces during bending in order to stabilize them when finished. Bezler Dep. at 35:4-18; Growney Report ¶ 7.40.

   [8] "Pour stop" fabrication consisted of forming a single 90 degree bend along the longitudinal centerline of approximate 4 x 8 x 1/8 flat steel stock. Eaton Report at 4.

himself.  Def.'s 56.1 Stmt ¶ 58.

The press brake remained in foot mode.  Eaton Report at 5.
Mustafa placed a piece of metal in the press brake and used his
right foot to make the ram descend and bend the metal.  Def.'s
56.1 Stmt ¶ 59.  As the ram ascended, Mustafa noticed that the
bent pour stop was stuck to the ram.  Def.'s 56.1 Stmt ¶ 61.
Mustafa put his hands up to remove the stuck pour stop from the
ram.  Def.'s 56.1 Stmt ¶ 63.  Before Mustafa could reach the pour
stop, it fell down into the machine, laying horizontally and less
than one foot behind the ram.  Def.'s 56.1 Stmt ¶ ¶ 63-64; Second
Mustafa Dep. at 227:20-228:2.  Mustafa instinctively reached both
hands through the opening in the press, between the ram and the
die, in order to retrieve the pour stop.  Def.'s 56.1 Stmt ¶ 65;
Growney Report ¶ 3.0; Eaton Report at 5.  While his arms were
within the area between the ram and the die, the ram came down
and severed both of his hands at the wrist.[9]  Complaint ¶ 6;

---

[9] Mustafa described the accident as follows:

I am going to try to say it exactly as how I
remember it.  I said that we did half of those stairs that
were left.  In the meantime, one of the supervisor[s] that
had actually hired me, which I don't even know his name, he
came and he changed the process.  He talked to Freddie
[Bezler] to change the work that we were doing.

Freddie adjusted the machine.  He did the first piece.
He might have done two; I don't remember exactly.  And after
that I started.  And the first piece that I did when the ram
went down, the metal bent and the ram normally went up.

The one that was not normal was that the metal was

Second Mustafa Dep. at 208:6-8; July 26, 2002 Deposition of

Mustafa ("Third Mustafa Dep.") at 104:7-9; Growney Report ¶ 3.0.

At the time Mustafa reached in after the pour stop, he had

his foot in the pedal housing.  Def.'s 56.1 Stmt ¶ ¶ 65, 66;

Second Mustafa Dep. at 228:10-229:21, 236:8-12.  Plaintiff's

expert opines that Mustafa inadvertently initiated the downstroke

of the ram that crushed his wrists with his foot while he was

reaching for the workpiece that had fallen behind the point of

operation.  Growney Report ¶ 7.30.  Halkin's expert testified

that the descending die caused Mustafa's injuries, although notes

that the toe-lock/release mechanism may have been inoperative on

the day of the accident and allowed for this usually prohibited

actuation.  Eaton Report at 5, 19-20.


**(6)**

**The Complaint and Motion for Summary Judgment**

Mustafa commenced this products liability and negligence

_____

       stuck with the ram that goes down.  This made me a little
       bit confused.  I put my hands up to pick up the piece from
       the ram and at the time that I touched the metal it was from
       the weight of the metal or from the shake of the press
       machine the metal came down.  And it didn't fall in the
       front but it fell in back of the press machine.  And my
       instincts, I went right behind the metal.

       At this time what I remember the ram fell down and cut my
       hand and from then on I don't remember anything else.

Second Mustafa Dep. at 207:9 - 208:8.

action against Halkin on June 28, 2000, claiming the press brake was unreasonably dangerous because it did not have adequate safeguards at the point of operation and because the operator was not warned against using a foot pedal without safeguards to protect the operator's hands.  Halkin impleaded Mustafa's employer, Eliou, as a third-party defendant, seeking contribution and indemnity.

On February 27, 2006, Halkin filed the instant motion for summary judgment on the grounds that 1) Mustafa was aware of the danger and could have avoided it by exercising reasonable care; 2) the press brake was not defectively designed because Halkin offered a light curtain as optional equipment and Eliou elected not to buy it; 3) Halkin had no duty to warn of an open and obvious danger and the warnings were not the proximate cause of the accident; 4) plaintiff's expert, Neil Growney, provided unreliable and, therefore inadmissible, testimony.

In its opposition brief, dated April 11, 2006, Mustafa contends 1) Mustafa's conduct was a foreseeable reaction to a common occurrence and was not so reckless as to relieve Halkin of liability; 2) the design of the press brake was unreasonably dangerous and there were five alternative designs that were practical and feasible at the time of the machine's design; 3) Halkin failed to warn about the dangers associated with foot pedal operation of the press brake with an unguarded point of

operation; and 4) the testimony of plaintiff's expert, Neil Growney, is reliable and admissible.

For the foregoing reasons, Halkin's motion for summary judgment is granted in part and denied in part.

## Discussion

### (1)

### Jurisdiction

Mustafa originally sued Halkin in New York State Supreme Court, Kings County. The case was removed to federal court on the basis of diversity. 28 U.S.C. § 1332. Mustafa is a resident of Kings County, New York. Halkin is a Canadian corporation. Plaintiff seeks damages of five million dollars for each count. The fact that third party defendant Eliou, a New York corporation, is a citizen of the same state as Mustafa does not destroy diversity jurisdiction. See Fidelity and Deposit Co. of Maryland v. City of Sheboygan Falls, 713 F.2d. 1261, 1266 (7th Cir. 1983) ("[I]t is clear that if a case is properly within the diversity jurisdiction and the defendant files a third-party complaint against a resident of the plaintiff's state the court does not lose jurisdiction over the plaintiff's claim.") (citations omitted).

### Reliability of Mr. Growney's Expert Testimony

During the course of this litigation, Mustafa retained an expert, Neal A. Growney ("Growney") to testify about the alleged design defect of the press brake and adequacy of the warnings on the press brake.[10] Growney produced a report, which is examined in detail below. Halkin now moves to exclude Growney's proffered expert testimony pursuant to Rules 702 of the Federal Rules of Evidence. <u>See</u> Defendant's Memorandum of Law in Support of Motion ("Def.'s Mem. in Supp.") at 21-24.

Under the Federal Rules of Evidence, the trial court must evaluate evidence for admissibility before considering that evidence in deciding a motion for summary judgment. <u>See</u> Fed. R. Evid. 104(a). The proponent of the evidence has the burden of proving by a preponderance of the evidence that it is admissible. <u>Bourjaily v. United States</u>, 483 U.S. 171, 175 (1987). If the expert testimony is excluded, the court must make the summary

---

[10] Halkin focuses its Rule 702 challenge on the reliability of Growney's opinions regarding design defect, not on his opinions regarding failure to warn. However, in a few sentences in its reply brief, Halkin asserts that Growney is not qualified to render an opinion on the sufficiency of the warnings. Reply at 9. As discussed in detail later, summary judgment is granted on Mustafa's failure to warn claims because there is no causal link between the alleged defect and the injury; thus, Growney's opinions on the alleged inadequacies of the warnings are superfluous. Accordingly, only the challenged reliability of Growney's testimony regarding design defect will be discussed herein.

judgment determination on the remainder of the record.  <u>Raskin v. Wyatt Co.</u>, 125 F.3d 55, 66 (2d Cir. 1997).  <u>See also</u> <u>Clarke v. LR Sys.</u>, 219 F. Supp. 2d 323, 331 (E.D.N.Y. 2002).

Admission of expert testimony is governed by Rule 702 of the Federal Rules of Evidence.  Rule 702 states in pertinent part:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon facts and data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Under Rule 702, the trial court acts as a gatekeeper, "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 597 (1993). This gatekeeping function applies to scientific testimony as well as expert testimony based on technical or other specialized knowledge.  <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 147 (1999).

In assessing the reliability of a proffered expert's testimony, a district court must focus not on the substance of the expert's conclusions, but on whether those conclusions were generated by a reliable methodology.  <u>Daubert</u>, 509 U.S. at 590. To assist district courts in determining whether an expert

17

opinion is reliable, the Supreme Court in <u>Daubert</u> laid out four
non-exclusive factors that the court may consider: (1) whether
the expert's technique or theory can be or has been tested; (2)
whether the expert's conclusions have been published and
subjected to peer review; (3) in the case of a scientific
technique, the potential or known error rate; and (4) whether the
expert's conclusions have gained general acceptance in the
relevant scientific community.  <u>Id.</u> at 593-94.

The <u>Daubert</u> factors are not a "definite checklist or test";
instead, this reliability test is "a flexible one," where the
court "may consider one or more" of the Daubert factors,
depending on the facts of the particular case.  <u>Donnelly v. Ford
Motor Co.</u>, 80 F. Supp. 2d 45, 48 (quoting <u>Kumho Tire</u>, 526 U.S. at
150).

Halkin concedes that Growney is qualified.[11]  Reply

---

[11] Growney received a B.S. in Mechanical Engineering from
the Newark College of Engineering, and is a licensed professional
engineer in New Jersey.  Growney Report ¶ 5.0.  He has had
thirty-seven years of mechanical engineering experience,
including over twenty-five years of safety experience and
responsibility in metal working manufacturing, and seventeen
years of hands-on press brake experience.  Growney Aff. ¶ ¶ 4-5;
Growney Report ¶ 5.0.  He is familiar with the design,
manufacture and operation of press brake machines and the safety
devices, mechanisms and safeguards that were available for use on
such machines.  Growney Aff. ¶ 5; Growney Report ¶ 5.0.  He also
has been personally involved in the design and development and
the application of guards and safety devices.  Growney Aff. ¶ 5;
Growney Report ¶ 5.0. Growney has preformed over three hundred
inspections and investigations of industrial accidents, including
press brake injuries similar to the one suffered by Mustafa.
Growney Aff. ¶ 6; Growney Report ¶ 5.0.

Memorandum of Law of Defendant/Third-Party Plaintiff Halkin Tool,

Ltd. ("Reply Mem.") at 9. However, Halkin argues that Growney's

testimony is unreliable, and thus inadmissible, because Growney

provides no basis or foundation for his opinions that the press

brake was defectively designed because it lacked guards at the

point of operation. Reply Mem. at 9-10. Halkin asserts the

following arguments in support of this contention: 1) Growney's

report fails to include possible scenarios that would <u>not</u> have

led to Mustafa's injuries; 2) Growney's failure to cite to

certain standards, for example, American National Standards

Institute ("ANSI") standard B11.3, in his report creates an

inference that the press brake conformed to these standards; 3)

Growney's relies on Occupational Safety and Health Administration

("OSHA") standards, and these standards apply to employers, not

to manufacturers; and 4) Growney is predisposed to the view that

the press brake was the cause of the accident. Def.'s Mem. in

Supp. at 10-12, 23.

First, Halkin contends that Growney's opinion is unreliable

because his report fails to include possible scenarios that would

<u>not</u> have led to Mustafa's injuries, such as that Mustafa did not

have to hold the metal he was bending at the time of the

accident, that the control station could have been placed further

away from the point of operation and that press brake could have

been operated in hand mode. Def.'s Mem. in Supp. at 22-23.

Foremost, Growney's Report does acknowledge that the control station is moveable and explains why the control station is not sufficient by itself to protect the operator from harm. See Growney Report ¶ ¶ 6.11, 7.52. Furthermore, the other scenarios Halkin asserts Growney should have included are irrelevant to Mustafa's theory of design defect, which is that the design of the press brake is defective because Halkin provided for foot pedal activation without designing into the press brake accompanying safeguards to protect the operator from injury when utilizing this mode. See, e.g., Growney Report ¶ ¶ 7.25, 7.33, 7.37, 7.47, 7.60, 8.5-8.7. Throughout its brief, Halkin sidesteps Growney's theory of design defect and instead harps on how the accident could have been avoided if Mustafa had operated the machine in hand mode instead of in foot mode. Because Growney focuses his report on the reasons the design of the press brake is unreasonably dangerous when used in foot mode and how alternative designs would have avoided Mustafa's accident, he has not included these irrelevant hypotheticals in his report. Accordingly, the absence of Halkin's proffered scenarios from Growney's report in no way renders his methodology or his opinions unreliable.

Next, Halkin contends that the press brake is safe because

it conformed with ANSI B11.3[12] and that Growney purposefully

sidesteps this acknowledgment by failing to discuss ANSI B11.3 in

his report.  Def.'s Mem. in Supp. at 21; Reply Mem. at 3, 9.

Contrary to Halkin's argument, Growney's failure to refer to

certain standards, such as ANSI B11.3, in his report does not

render his opinions unreliable.  In fact, courts have held

admissible the testimony of experts who failed to discuss <u>any</u>

industry standards in their expert report and even those who have

confused safety standards, finding that this goes to the weight,

not the admissibility, of the expert's testimony.  <u>See, e.g.</u>,

<u>Marmol v. Biro Mfg. Co.</u>, No. 93-CV-2659, 1997 WL 88854, at *4

(E.D.N.Y., Feb. 24, 1997) (finding expert testimony admissible

even though expert did not consult government regulations or

industry standards when concluding that product was defectively

designed); <u>Bunt v. Altec Indus., Inc.</u>, 962 F. Supp. 313, 318

(N.D.N.Y. 1997) (holding that expert's "neglect to satisfactorily

resolve an apparent contradiction between ANSI regulations" goes

to the weight and credibility of the expert's testimony rather

_____

[12]  Halkin points out that section 4.4.4.3 of ANSI B11.3
permits use of a foot pedal as long as the pedal is protected
from accidental activation.  Halkin also points out that section
6.1.4 of ANSI B11.3 specifies that the employer, after evaluating
the machine and use, shall provide point of operation
safeguarding.  ANSI B11.3-1982(R1994), § 6.1.4 ("[i]t shall be
the responsibility of the employer, after selecting the tooling
and specific type of power press brake for producing a piece
part, to evaluate that operation before the piece part is worked
(bent, etc.) and to provide point-of-operation safeguarding
according to the provisions of 6.1.4(1)...").

than to its admissibility).

Here, as Halkin itself points out in its papers, Growney did, in fact, consult ANSI B11.3 and consider it as an authoritative source when forming his opinions. Def.'s Mem. in Supp. at 10, 23. In forming his opinions, Growney also consulted relevant industry rules, and specifically cited to ANSI B15.1, section 212(a)(3)(ii) of 29 Code of Federal Regulations 1910, New York State Industrial Code Rule 19 and the National Safety Counsel's Prevention Manual in his report.[13] <u>See</u> Growney Aff. at ¶ 7; Growney Report ¶ ¶ 7.7, 7.16-7.18, 7.20, 7.45-7.47. There is certainly enough to link the sources in Growney's report with his conclusion that the press brake was defectively designed because there were no guards at the point of operation, even without specific mention of ANSI 11.B3.

Moreover, the basis of Halkin's argument is ill-founded. Whether or not a product conforms to a specific safety standard is not dispositive of the issue of defective design. <u>Church Ins.</u>

---

[13] ANSI B15.1 states "no employee, regardless of training, intelligence and intent can be 100 percent alert 100 percent the time." ANSI B15.1-1972.

OSHA provision, section 212(a)(3)(ii) of 29 Code of Federal Regulations 1910, provides "[t]he point of operation of machines whose operation exposes an employee to injury, <u>shall be guarded</u>." 29 CFR 1910.212(a)(3)(ii) (emphasis added).

Section 19.8(a) of New York State Industrial Code Rule 19, entitled "Guarding point of operation of dangerous machinery and other hazards" states "(a) Machines having a . . . pressing . . . action, in which the operator's hands may come within a danger zone, shall be guarded in one of the ways specified in this Part ..." New York State Industrial Code Rule 19, § 19.8(a).

Co. v. Trippe Mfg. Co., No. 04-CV-6111, 2005 WL 2649332, at *2

(S.D.N.Y. Oct 17, 2005) ("[C]ompliance with industry standards is

certainly not dispositive of a design defect claim grounded in

strict products liability, and would also be insufficient to

support summary judgment," though it may be relevant to whether a

product was reasonably safe as designed and whether the

alternative designs were feasible). See also Tufariello v. Long

Island R. Co., 458 F.3d 80, 91 (2d Cir. 2006) ("Compliance with

OSHA standards . . . has been held not to be a defense to state

tort or criminal liability.") (quoting UAW v. Johnson Controls,

Inc., 499 U.S. 187, 214 (1991) (White, J., concurring in part and

concurring in the judgment)). Instead, this is only one of

several factors for the jury to consider when deciding if the

design was reasonably safe. See Clarke, 219 F. Supp. 2d at 334

("'Compliance or lack of compliance with industry safety

standards . . . is not dispositive of the issue of a design

defect and other evidence concerning the design and safety of the

machine may be considered.'") (quoting Del Cid v. Beloit Corp.,

901 F. Supp. 539, 545 (E.D.N.Y. 1995). See also Sawyer v. Dreis

& Krump Mfg., 67 N.Y.2d 328, 337, 502 N.Y.S.2d 696, 701, 493

N.E.2d 920, 925 (1986) (noting that industry standards are not

dispositive in a negligence action and that the jury should have

been instructed to consider industry standards along with all

other evidence presented). In fact, in a case very similar to

23

the one at hand involving a press brake designed without a safety
guard, the Second Circuit, applying New York law, held that the
industry custom of leaving it to machine users to attach safety
guards was only one of several factors to be considered by the
jury in deciding whether the design was reasonably safe. <u>Jiminez</u>
<u>v. Dreis & Krump Mfg. Co.</u>, 736 F.2d 51, 54 (2d Cir. 1984); <u>accord</u>
<u>Murphy v. L & J Press Corp.</u>, 558 F.2d 407, 410-12 (8th Cir. 1977)
(industry custom and OSHA regulation placing sole or shared duty
to guard on user of press machine not dispositive of
manufacturer's duty to guard). Thus, even if the jury eventually
finds that ANSI B11.3 is representative of the general custom or
usage in the industry[14] and that the press brake conformed to
this standard, the press brake's compliance with ANSI standards
does not impact the reliability of Growney's conclusions, nor
does it preclude Growney from considering other evidence in
forming his opinion on design defect. <u>Clarke</u>, 219 F. Supp. 2d at

---

[14] Before a promulgated safety standard can even be
considered by a jury in a products liability action, the jury
must first conclude that the standard represents the general
custom or usage in the industry. <u>Sawyer</u>, 67 N.Y.2d at 337, 502
N.Y.S.2d at 701, 493 N.E.2d at 925 (noting the jury could only
consider industry standards in the question of negligence "if it
first found that the standards . . . represented the general
custom or usage in the industry"); <u>Anderson v. Hedstrom Corp.</u>, 76
F. Supp. 2d 422, 450 (S.D.N.Y. 1999)(concluding that the question
of whether the ANSI or ASTM requirements constitute the industry
standard and the question of whether the defendant's compliance
or lack of compliance with the appropriate standard, when
considered with other facts and circumstances of the case, should
result in liability should be left to the jury).

335 (holding "simply because [challenged product] was in compliance with the ANSI standard does not make [expert's] conclusion unreliable."). If it were otherwise, there would be no need for expert opinions once the appropriate industry safety standard was identified and conformance or nonconformance with that standard was established. Growney considered ANSI B11.3, among other data, in forming his opinion on whether the challenged design was defective and rendered an admissible, reliable opinion. Growney's failure to include ANSI B11.3 in his report does not change this. Halkin's argument that Growney failed to include the press brake section of the National Safety Counsel's Prevention Manual is unavailing for the same reasons.

Halkin additionally argues that there is no basis for Growney's opinion that Halkin should have designed point of operation guards into the machine because OSHA and ANSI B11.3 require the employer, not the manufacturer, to insure guarding is installed on press brake machines. Thus, Halkin asserts that Growney's reliance on OSHA standards renders his opinion unreliable because OSHA cannot be used as a basis to impose a duty to install point of operation guarding on Halkin. Reply Mem. at 3-5.

Foremost, Growney concedes that OSHA governs the conduct of employers. See Growney Report ¶ 7.45. Furthermore, Growney does

not rely on OSHA regulations to impose a duty on Halkin.[15] Instead, Growney relies on OSHA regulations as evidence that it was well-known in the industry in and before 1990 that press brakes are not safe without guards at the point of operation and that these concerns were enough to give rise to industry standards, such as OSHA, which place the responsibility of installing guarding on the employer. This makes sense in the context of Growney's testimony that industry standards, like ANSI and OSHA, are only a minimum requirement and that the press brake could still be unsafe even if it complied with these standards. See Growney Report ¶ ¶ 7.18-7.19.

Finally, Halkin's argument that Growney is predisposed to the view that the press brake is the cause of the accident is unavailing. Halkin attempts to equate Growney's methodology to the expert whose testimony was found inadmissible in Barban v. Rheem Textile Sys., No. 01-CV-8475, 2005 U.S. Dist. LEXIS 5996, at *11 (Feb. 11, 2005), aff'd, 147 Fed. Appx. 222 (2d. Cir. 2005). However, they are not sufficiently analogous. Unlike the expert in Barban, Growney does not espouse the view that the press brake must be accident-proof and that the manufacturer is an insurer against injury. On the contrary, he lays out alternative designs with safeguards that he opines could have

---

[15] In fact, Growney's mention of the OSHA regulations bolsters Halkin's position that the employer was the entity responsible for installing safeguards.

26

been implemented with little difficulty and would have made the risk of injury substantially less likely.  <u>See</u> Growney Report at ¶ ¶ 7.33-7.36.  Furthermore, unlike the expert in <u>Barban</u> who had a conclusory report, did not provide appropriate support for his opinions and blatantly disregarded contradictory deposition testimony, Growney relies on sources recognized in the field[16] and sets forth the basis for his opinions in great detail. Thus, the methodology Mr. Growney used in rendering his opinion satisfies the requirements of Federal Rule of Evidence 702. <u>Keenan v. Mine Safety Appliances Co.</u>, No. 03-CV-0710, 2006 WL 2546551, at *3 (E.D.N.Y. Aug. 31, 2006) (finding expert's opinions satisfies Federal Rule of Evidence 702); <u>Clarke</u>, 219 F. Supp. 2d at 334 (same).

Ultimately, Halkin takes issue with Growney's conclusions, not with his methodology.  However, where an expert's underlying methodology is reliable, defects in the conclusion drawn should be explored on cross-examination and go the weight of the evidence, not its admissibility.  <u>Marmol</u>, 1997 WL 88854, at *4 ("The 'traditional and appropriate means' of attacking such evidence is through vigorous cross-examination and presentation of contrary evidence, rather than exclusion") (quoting <u>B.F. Goodrich v. Betkoski</u>, 99 F.3d 505, 525-26 (2d Cir. 1996). Accordingly, Halkin's motion to exclude Growney's testimony is

---

[16] In fact, Halkin's expert relies on similar sources.

denied and Halkin's criticisms of Growney's opinions may be explored on cross-examination.  As Growney's testimony is admissible, his expert report will be considered in deciding the remaining issues in the instant motion for summary judgment.

## (3)

### Design Defect

Mustafa argues that the design of the press brake was unreasonably dangerous because it failed to include adequate safeguards at the point of operation and proposes five alternate designs that would have prevented the injury.[17]  The defective design claims are based in both strict products liability and in negligence.

Halkin moves to dismiss Mustafa's design defect claims on

---

[17] The five proposed alternative designs are a fixed barrier guard, a moveable barrier guard, restraints, pull backs and a light guard.  A fixed barrier guard is a guard that would limit the point of operation to an opening only large enough to feed a sheet of metal, thereby preventing body parts from entering the point of operation.  Schonfeld Aff. ¶ 63.  A moveable barrier guard is a device that must be moved into position in order for the machine to operate.  If an obstruction, such as a body part, prevents it from being locked into position, the machine will not activate.  Id. ¶ 64.  Restraints are devices that allow the operator greater flexibility using his or her hands, but prevent the hands from entering point of operation.  Id. ¶ 65.  Pull backs only allow the operator's hands to enter the point of operation when the ram is in the up position.  Id. ¶ 66.  A light guard is a presence-sensing device which instantly stops press brake activation if an operator's hand or other object is detected in the sensing field, or "curtain," of the device.  ANSI B11.3-1982, § 6.1.4.2.2.

two grounds: 1) Mustafa was aware of the danger posed by the point of operation and he cannot demonstrate that his injury could not have been averted by reasonable care; and 2) the design of the press brake was not defective because Halkin offered a light curtain, one of Mustafa's five proposed alternate designs, as optional safety equipment to Eliou at the time of sale of the press brake and Eliou elected not to buy this option.

## a. Strict products liability and negligence claims based on defective design

In order to make out a prima facie case for strict product liability under a design defect theory, a plaintiff must show that:

> (1) the product is "defective"[18] because it is not reasonably safe as marketed; (2) the product was used for a normal purpose; (3) the defect was a substantial factor in causing the plaintiff's injuries; (4) the plaintiff by the exercise of reasonable care would not have both discovered the defect and apprehended its danger; (5) the plaintiff would not have otherwise avoided the injury by the exercise of ordinary care.

---

[18] Under New York law, the design of a product is defective "if the design defect were known at the time of manufacture, a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner." Voss, 59 N.Y.2d at 108, 450 N.E.2d at 208, 463 N.Y.S.2d at 402. The plaintiff bears the burden of presenting evidence that "it was feasible to design the product in a safer manner and that the proposed design would have prevented some of plaintiff's injuries." Ferracane v. United States, No. 02-CV-1037, 2007 U.S. Dist. LEXIS 6569, at *15-16 (E.D.N.Y. Jan. 29, 2007).

<u>Faryniarz v. Nike, Inc.</u>, No. 00-CV-2623, 2002 WL 530997, at *1-2 (S.D.N.Y. Apr. 8, 2002) (citing <u>Urena v. Biro Mfg. Co.</u>, 114 F.3d 359, 363 (2d Cir. 1997)). <u>See also</u> <u>Fane v. Zimmer, Inc.</u>, 927 F.2d 124, 128 (2d Cir. 1991); <u>Codling v. Paglia</u>, 32 N.Y.2d 330, 342, 345 N.Y.S.2d 461, 470-471, 298 N.E.2d 622, 628-629 (1973).

Where the plaintiff claims negligence under a design defect theory, the focus shifts from the characteristics of the product itself to the conduct of the manufacturer; plaintiff must additionally prove that the manufacturer could have foreseen the injury and, therefore, acted unreasonably in designing the product. <u>See</u> <u>Voss</u>, 59 N.Y.2d at 107, 450 N.E.2d at 207, 463 N.Y.S.2d at 401; <u>Blandin v. Marathon Equip. Co.</u>, 9 A.D.3d 574, 567, 780 N.Y.S.2d 190, 192 (3d Dep't 2004) (citation omitted).

**b. The Reasonableness of Mustafa's Conduct**

Halkin first argues that summary judgment is warranted on Mustafa's design defect claims because Mustafa was aware of the danger posed by the point of operation and his injury could have been averted by reasonable care.

Whether a plaintiff exercised the degree of care required under the circumstances is generally a question of fact for the jury and is rarely suitable for determination as a matter of

law.[19]  See, e.g., Del Cid, 901 F. Supp. at 549-550 ("proximate
cause, negligence and foreseeability normally are questions of
fact, and are rarely suitable for determination as a matter of
law.").  Furthermore, since New York has adopted comparative
fault, see Civil Practice Law and Rules, § § 1411-1413,
negligence on the part of the plaintiff or failure to perceive an
obvious danger is no longer an automatic bar to recovery.
Micallef v. Miehle Co. Div. of Miehle-Goss Dexter, 39 N.Y.2d 376,
387, 348 N.E.2d 571, 578, 384 N.Y.S. 115, 122 (1976) (recovery is
not precluded because the danger is obvious).  In fact, a
plaintiff's culpability in failing to exercise care will only bar
recovery if that conduct is sole cause of injury.  Sheppard v.
Charles A. Smith Well Drilling and Water Sys., 93 A.D.2d 474,
478, 463 N.Y.S.2d 546, 549 (3d Dep't 1983) ("today, if a product
is not reasonably safe for its intended or reasonably foreseeable
use, culpability on the part of a plaintiff in mishandling the
product or in failing to exercise reasonable care to discover the
defect, etc., will not bar recovery unless that conduct is found
to be the sole cause of plaintiff's injury.").  See also

_____

[19] At this point, there are still issues of fact about how
the accident actually happened.  Halkin's expert testified that
the toe-lock/release mechanism on the foot pedal may have been
inoperative on the date of the accident, permitting foot switch
actuation that would otherwise have been prohibited.  Eaton
Report at 19-20.  Thus, Eliou's failure to properly inspect and
maintain this device may have been a causal factor in Mustafa's
injury.

Hedstrom Corp., 76 F. Supp. 2d at 456; Del Cid, 901 F. Supp. at
553 ("Although a plaintiff's or third-party's negligent acts are
always relevant to the issue of damages, seldom are they
sufficient to preclude a finding that a design defect was the
proximate cause of an injury.") (emphasis in original) (internal
citations omitted).  See also PRODUCTS LIABILITY IN NEW YORK 17-
18 (Neil A. Goldberg ed., 2002) (where defendant proves that
plaintiff misused the product, could have discovered the defect
by using reasonable care or could have avoided the injury by
using reasonable care, damages will be diminished by the
percentage of plaintiff's fault.  Only where plaintiffs actions
are "outrageous enough to contraindicate existence of a defect or
are demonstrably the proximate cause of the injury" will the
design defect claim fail as a matter of law or fact.).

     In support of its argument, Halkin cites to Marshall v.
Sheldahl, 150 F. Supp. 2d. 400, 404 (N.D.N.Y. 2001), a products
liability case in which the court found the plaintiff's conduct
justified summary judgment on the strict products liability and
negligence claims alleging defective design.  Def.'s Mem. in
Supp. at 13-15.  There, plaintiff was operating a machine
designed to manufacture plastic bags when she noticed that there
was a tear on the roll of material passing through the feeder end
of the machine.  Marshall, 150 F. Supp. 2d. at 402.  Instead of
turning off the machine, plaintiff walked to the rear and grabbed

the moving material as it entered the machine in at attempt to reattach it. Id. As she did so, her hand was drawn inside the machine into the "nip point" between the machine's rollers, resulting in amputation of her index finger. Id. The court held that "the dangers of the plastic conveyor portion of [the machine] were so open and obvious that no reasonable person would attempt to reach into it and grab the [material] without first shutting the machine off." Id. Halkin contends that, like the plaintiff in Marshall, Mustafa failed to exercise "even the slightest degree of care" and that Mustafa could have avoided the injury, for example, by turning off the machine or by removing his foot from the pedal housing after the metal was bent. Def.'s Mem. in Supp. at 14.

Given the record presented, there are not sufficient facts to establish Mustafa's contributory negligence as a matter of law. Frederick v. Niagara Mach. & Tool Works, 107 A.D.2d 1063, 1064, 486 N.Y.S.2d 565 (4th Dep't 1985) ("Whether reaching into the die area [of punch press] or accidentally striking the start button (if the jury finds that that is what occurred) constituted contributory negligence should be for the jury to resolve."). Unlike the plaintiff in Marshall who consciously walked around to the back of the machine to reach into the dangerous "nip point" inside the machine, Mustafa testified that his actions were instinctive. Second Mustafa Dep. at 207:9-208:8. Halkin itself

argues that the cause of the accident was "the combination of confusion, the instinctive reach in and the failure to remove the foot from the pedal." Def.'s Mem. in Supp. at 14. Given this characterization, it is unclear how Halkin can then argue that Mustafa's conduct was a "gross overreaction to an occurrence that did not require immediate attention." Id. at 14.

Furthermore, unlike the plaintiff in Marshall, whom the court found was injured in an unforeseeable way, i.e. by the "nip point" located inside the machine, it is reasonably foreseeable that an operator would unintentionally activate the press break via foot pedal when distracted while his or her hands were near or inside the point of operation. Growney testified that OSHA has a list of more than fifty accident investigations from 1984 through 1990 involving injuries similar to those suffered by Mustafa and that OSHA's regulations target the dangers of operating a machine without installing the proper safeguards. Growney Report at ¶ 7.46. Furthermore, Halkin testified that it designed the press brake with these concerns in mind. Deposition of Colin Dean Albrecht ("Albrecht Dep.") at 63:19-21. In fact, Halkin installed palm controls on the machine as a standard, though by-passable, feature in order to prevent this common occurrence from happening. Albrecht Dep. at 63:19-65:6. See Del Cid, 901 F. Supp. at 550 ("even if plaintiff's actions were negligent, the negligent and unintended acts of employees are

often foreseeable, and are frequently taken into account in the design and manufacture of machinery").  While the exact way in which the accident occurred might not have been foreseeable, the fact that an operator might accidentally depress the foot pedal while his hands are in the point of operation certainly falls within the range of risks that led to Mustafa's injury. RESTATEMENT (SECOND) OF TORTS § 435(1) (1977) ("If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor [did not foresee] ... the manner in which [the harm] occurred does not prevent him from being liable"); Derdiarian v. Felix Contracting Corp., 51 N.Y.2d 308, 315, 414 N.E.2d 666, 670, 434 N.Y.S.2d 166, 169 (1980) (plaintiff need not demonstrate that the precise manner in which the accident happened was foreseeable).  Thus, Mustafa did not exhibit such an outrageous lack of ordinary and reasonable care as to require summary judgment of the design defect claim.  See, e.g., Ploof v. Stone Const. Equip., Inc., 221 A.D.2d 1008, 1009, 634 N.Y.S.2d 278, 279 (4th Dep't 1995) (overturning grant of summary judgment on strict liability design defect claim where plaintiff admitted he was aware of danger of placing his hands in cement mixer while mixer blades were rotating, finding genuine issue existed whether that alleged defect, in addition to plaintiff's own conduct, was a substantial factor in causing plaintiff's injury).

Additionally, it is clear that Mustafa's conduct, however culpable, was not the sole cause of the accident, insulating Halkin from liability. Even though reaching into the point of operation without first pushing the stop button or removing his foot from the pedal may have been a negligent act contributing to the accident, had the point of operation been guarded this accident never would have happened. Mustafa's conduct did not abrogate the possibility that the absence of a safeguard for use with foot pedal actuation was a substantial factor in causing plaintiff's injury. The fact that an employee could activate the ram via foot pedal while his hand is near or inside the point of operation for some normal purpose and get hurt doing so precludes a finding that Mustafa's conduct was the sole cause of his injuries. See Del Cid, 901 F. Supp. at 553 ("even if [plaintiff's] alleged negligent misuse of the machine and [employer's] failure to provide an appropriate chain container and to properly train and supervise [plaintiff] all were unforeseeable, that would not defeat the fact that [manufacturer's] failure to properly guard the pinch point was a proximate cause of the accident"). It will, therefore, be up to the jury to determine whether the absence of accompanying safety device constituted a design defect, whether that alleged defect, in addition to Mustafa's conduct, was a substantial factor in causing plaintiff's injury, and, if so, the proper apportionment

of fault.  See, e.g., Wesp v. Carl Zeiss, Inc., 11 A.D.3d 965,

969, 783 N.Y.S.2d 439, 442 (4th Dep't 2004)( "Because we have

concluded that there are issues of fact concerning defendants'

liability, we reject defendants' contention that the conduct of

plaintiff was the sole proximate cause of her injuries;

comparative fault must be determined by the trier of fact.");

Ploof, 221 A.D.2d at 1008, 634 N.Y.S.2d at 278.


**c. Failure to purchase optional safety equipment**

Next, Halkin argues that the design of the press brake is

not defective as a matter of law because Halkin offered a light

curtain as optional equipment and Eliou elected not to buy it.[20]

---

[20] Mustafa argues that the design of the press brake is
defective because Halkin provided for foot pedal actuation
without designing necessary safeguards into the press brake.  He
proffers five alternative designs - fixed barrier guards,
moveable barrier guards, restraints, pull backs and a light
curtain - and argues that, had any of these fixtures been
incorporated into the standard design of the press brake, the
press brake would have been reasonably safe.  Growney Report ¶ ¶
7.12-7.14; Mem. in Opp. at 18, 22.  Of the five alterative
designs that Mustafa advocates, Halkin actually offered the light
curtain as optional, though not standard, equipment.  Halkin did
not offer fixed barrier guards, moveable barrier guards,
restraints or pull backs as optional equipment on the subject
press brake.
    Importantly, Halkin's summary judgment motion does not
challenge the feasibility of the light curtain, or any of the
other proposed reasonable alternate designs.  Halkin, instead,
seeks to prevent the plaintiff from presenting a design defect
claim to the jury based on failure to include a light curtain as
part of the standard design of the machine because it offered the
light curtain as a separate, purchasable option.  After the
summary judgment motion was fully briefed and after oral argument
on the motion, Halkin submitted a supplemental expert affidavit,

While, generally, a manufacturer is considered to be "in the superior condition to discover any design defects and alter the design before making the product available to the public," <u>Voss</u>, 59 N.Y.2d at 107, 450 N.E.2d at 207-208, 463 N.Y.S.2d at 401-402, the New York Court of Appeals recognized an exception to this rule where the manufacturer offers optional safety devices but the buyer opts not to purchase them. <u>Scarangella v. Thomas Built Buses</u>, 93 N.Y.2d 655, 661, 695 N.Y.S.2d 520, 524, 717 N.E.2d 679, 683 (1999).[21] According to <u>Scarangella</u>, a manufacturer that

discussing the effectiveness and cost of a light curtain in various operating conditions. Supplemental Affidavit of William B. Eaton ("Eaton Supp. Aff.). This evidence speaks to the risk-utility analysis necessary to determine whether the light curtain was a reasonable alternative design. However, as Halkin did not properly raise this issue in its motion papers and, consequently, plaintiff was not afforded an opportunity to brief this issue, the issue whether plaintiff made out a prima facie case of design defect based on the light curtain as a reasonable alternative design will not be decided. The citation to the supplemental expert affidavit will, therefore, be noted only where relevant to issues properly before the court.

[21] <u>Scarangella</u> involved a school bus driver who was injured when a school bus, manufactured by defendant, struck the plaintiff while being operated by a co-employee in reverse. 93 N.Y.2d at 657, 695 N.Y.S.2d at 521, 717 N.E.2d at 680. The accident took place in the yard where the plaintiff's employer kept the buses. <u>Id.</u> at 657, 695 N.Y.S.2d at 521, 717 N.E.2d at 680. When the employer purchased the bus, a back-up alarm system that automatically sounded a warning when a bus is placed in reverse gear had been offered as an option, but the employer decided not to purchase it. <u>Id.</u> at 657-58, 695 N.Y.S.2d at 521-22, 717 N.E.2d at 680-81. Plaintiff claimed that the manufacturer's failure to make the back-up alarm a standard feature was a design defect. <u>Id.</u> at 658, 695 N.Y.S.2d at 522, 717 N.E.2d at 681. The New York Court of Appeals went through a three-part analysis and concluded that plaintiff was properly barred from presenting this particular design defect claim.

fails to include a safety feature on its product as standard equipment but makes it available to the buyer as a purchasable option will not be liable for design defect as a matter of law where the evidence and reasonable inference show:

> 1) the buyer is throughly knowledgeable regarding the product and its use and is actually aware that the safety feature is available; 2) there exist normal circumstances of use in which the product is not unreasonably dangerous without the optional equipment; and 3) the buyer is in a position, given the range of uses of the product, to balance the benefits and risks of not having the safety device in the specifically contemplated circumstance of <u>the buyer's</u> use of the product.

<u>Id.</u> at 661, 695 N.Y.S.2d at 524, 717 N.E.2d at 683 (emphasis in original). If these factors are present, the buyer, not the manufacturer, is in the superior position to make the risk utility assessment and the buyer's decision to forgo the optional safety equipment absolves the manufacture of liability. <u>Id.</u> The product will not be found defective, the plaintiff will have failed to make a prima facie case of design defect. <u>Euclides Campos v. Crown Equip. Corp.</u>, No. 01-CV-0174, 2001 U.S. Dist. LEXIS 24575, at *5 (S.D.N.Y. Aug. 31, 2001). However, if one of these factors are not present, liability may be imposed. <u>Scarangella</u>, 93 N.Y.2d at 661, 695 N.Y.S.2d at 524, 717 N.E.2d at 683; 15 N.Y. Prac. New York Law of Torts, § 16:72.10.

On a motion for summary judgment, the defendant has the initial burden of establishing that all three <u>Scarangella</u> factors are satisfied. <u>See, e.g.</u>, <u>Campbell v. Int'l Truck and Engine</u>

Corp., 32 A.D.3d 1184, 1185, 822 N.Y.S.2d. 188, 190 (4th Dep't 2006). Then, the burden shifts to the plaintiff to raise an issue of fact with respect to at least one of the factors in order to survive summary judgment on that particular design defect theory. See, e.g., Beemer v. Deere & Co., 17 A.D.3d 1097, 1098, 794 N.Y.S.2d 253, 254-55 (4th Dep't 2005); Bova v. Caterpillar, Inc., 305 A.D.2d 624, 625-26, 761 N.Y.S.2d 85, 87 (2d Dep't 2003); Passante v. Agway Consumer Prods. Inc., 294 A.D.2d 831, 832, 741 N.Y.S.2d 624, 626 (4th Dep't 2002).

### i. **First and Third Scarangella factors**

The first Scarangella factor requires the buyer to be throughly knowledgeable about the product and its use and be actually be aware that the safety feature is available. Halkin proffers that Eliou had been in the metal forming business for approximately 20 years before it purchased the instant press brake in 1990 and that bending steel on a press brake was fundamental to Eliou's business. Def.'s Mem. in Supp. at 17; P. Eliou Dep. at 66:19-86:10. Halkin provides evidence that Eliou was actually aware that the light curtain was available. Peter Eliou testified that a document entitled "Optional" was given to him at the time of sale and that the salesperson explained all of the options listed on that document, including the light curtain, to him. P. Eliou Dep. at 90:17-93:18. The "Optional" document

was among Eliou's purchase documents for the product.  <u>See</u> Aff.
of Schonfeld, Ex. L.  It states that the light curtain was
available as a purchasable option and describes its
functionality.  <u>See</u> <u>id.</u>  Thus, Halkin has met its burden with
respect to the first <u>Scarangella</u> factor.  <u>See</u> <u>Cordani v. Thompson</u>
<u>& Johnson Equip. Co., Inc.</u>, 16 A.D.3d 1002, 1004-05, 792 N.Y.S.2d
675, 677-79 (3d Dep't 2005).  As Mustafa submits no evidence to
the contrary, he failed to raise a triable issue of fact
regarding this factor.

The third <u>Scarangella</u> factor requires the buyer to be in a
position, given the range of uses of the product, to balance the
benefits and risks of not having the particular safety device in
the specifically contemplated circumstance of the buyer's use of
the product.  Halkin argues that Eliou was the party in the best
position to exercise an intelligent judgment to make the trade-
off between cost and function of the light curtain because the
press brake is a multi-purpose machine, the types of bending
formations each buyer uses varies across job site, and that,
depending on the bending formation at hand, the effectiveness of
the light curtain as a safety device varies.[22]  Eaton Supp. Aff.

----

[22] This is because some forming sequences, for example,
forming metal with perpendicular sides, may penetrate the light
curtain and stop press brake operation.  Eaton Supp. Aff. ¶ 3.
As a result, the light curtain may have to be "blanked out" to
allow for these types of metal bending processes.  <u>Id.</u> at ¶ 4.
The blanking feature deliberately eliminates a portion of the
protection intended by the light curtain.  <u>Id.</u>

¶ ¶ 3-5.  Although Halkin did not show that Eliou actually

weighed the risks against the costs and made a considered

decision not to buy the light curtain,[23] it is clear that Eliou

knew the particular bending formations it would be utilizing and

was in a position to assess the efficacy of alternative safety

devices to determine which safety device was most appropriate

given its contemplated uses of the press brake.[24]  Thus, Halkin

sustained its burden of establishing the third factor and

---

[23] Cf. Campos, 2001 U.S. Dist. LEXIS 24575, at *9 (holding
employer in the best position to balance the risks and benefits
of back-up alarm on forklift where the employer took "into
account factors including the size of its warehouse, the number
of employees, the number of forklifts and the nature of training
it would offer to its employees who would operate the forklift");
Scarangella, 93 N.Y.2d at 662, 695 N.Y.S.2d at 525, 717 N.E.2d at
684 (holding employer was in a position to balance the benefits
and dangers of back-up alarm on buses where employer "made a
considered decision not to buy the back-up alarm," taking into
account noise pollution, neighborhood relation and training it
would give its employees in absence of back-up alarm).

[24] Halkin's expert testified that alternative safeguarding
means, such as a pull backs or restraints, "may be more
compatible with the press brake usage under prevailing plant
operating conditions and, more importantly, provide more reliable
and effective operator protection against point of operation
exposure and injury [than the light curtain]."  Eaton Supp. Aff.
¶ 8.  However, Halkin did not offer these "more reliable and
effective" alternative safeguarding devices; in fact, the only
safeguards compatible with foot pedal actuation offered by Halkin
were the light curtain, which must be muted to allow for certain
bending formations, and a moveable control station, which permits
unobstructed access to the point of operation when located close
to the machine.  If it is determined that the press brake was
defectively designed, manufacturers of press brake machines
operable by foot pedal might then have to offer a variety of
safety devices, allowing the buyer the option to choose which
safety device it would like to install for use with the press
brake, given the buyer's contemplated use.

plaintiff failed to raise any triable issue of fact in regard to this factor.

###   ii.   Second <u>Scarangella</u> factor

The second <u>Scarangella</u> factor requires Halkin to show that there are normal circumstances where the press brake was not unreasonably dangerous without the installment of a light curtain.  Halkin argues that the second factor is met because 1) the press brake meets all applicable national and industry standards; 2) a safe distance between the press brake and moveable control station was a sufficient safety feature; 3) the option to operate the machine in hand mode was a sufficient safety feature; 4) the stop button on the control station would have shut the machine off without the point of operation guards; and; 5) the operator of the press brake was never required to have any part of his body "anywhere near the point of operation" when operating the press brake in foot mode.  Def.'s Mem. in Supp. at 18; Reply Mem. at 6-8.

First, the parties dispute whether the design of the press brake "met all applicable national and industry" standards.  <u>See</u> Def.'s Mem. in Supp. at 17-18; Mem. in Opp. at 18.  Even if there was no dispute, as discussed above, case law has made clear that compliance with applicable national and industry standards is relevant, though not dispositive of the issue of defective design

and negligence.  <u>See, e.g.</u>, <u>Church Ins. Co.</u>, 2005 WL 2649332, at

*2; <u>Clarke</u>, 219 F. Supp. 2d at 334 (quoting <u>Del Cid</u>, 901 F. Supp.

at 545; <u>Sawyer</u>, 67 N.Y.2d at 337, 502 N.Y.S.2d at 701, 493 N.E.2d

at 925.  Thus, the fact that "the hand/foot selector is a

permitted design" and that "no law mandates the use of a light

curtain," Def.'s Mem. in Supp. at 18, is insufficient to conclude

as a matter of law that the machine is not unreasonably dangerous

without the light curtain.[25]  It is only one factor for the jury

to consider.  <u>See, e.g.</u>, <u>Jiminez</u>, 736 F.2d at 54 (industry custom

of leaving it to machine users to attach safety guards was only

one of several factors to be considered by the jury in deciding

whether the design was reasonably safe in case involving a press

brake designed without a safety guard).

Second, Halkin offers two normal circumstances where the use

of the press brake is not unreasonably dangerous without the

light curtain: 1) when the control station is a sufficient

distance from the press brake; and 2) when selecting and using

hand mode.  Regarding the first circumstance, both parties agree

that the control station is moveable and not fixed a specific

distance from the press brake.  Szpilzinger Aff. ¶ 22.  While

---

[25]  Indeed, the cases Halkin cites to only consider the fact
that federal or state laws did not mandate that the optional
safety feature be standard as one of many factors in the
analysis.  <u>See, e.g.</u>, <u>Cordani</u>, 16 A.D.3d at 1006; 792 N.Y.S.2d at
679; <u>DiMaria v. Komatsu Forklift U.S.A., Inc.</u>, No. 02-CV-589,
2003 U.S. Dist. LEXIS 10550, at *6-7 (E.D.N.Y. June 20, 2003).

Halkin points out that the control station can be placed a "safe distance" from the press brake, Def.'s Mem. in Supp. at 18, it does not offer evidence on how far the control station normally is from the press brake in industry practice.[26]  Although an independent reading reveals that ANSI has a formula for ensuring the control station be a "minimum safe distance" from the press brake, ANSI B11.3-1982, § 6.1.4.3, Mustafa raises a triable issue of fact whether keeping the control station a safe distance from the point of operation is industry practice.  Specifically, Mustafa's expert explains that the control station's "mobility facilities its placement in close proximity to the press brake's dangerous point-of-operation hazard."  Growney Report at ¶ 7.52. Growney also testifies that "[i]ndustry experience indicates that operators are likely to do what expedites press brake operations."  Growney Report at ¶ 7.52.  See also Deposition of Neal A. Growney ("Growney Dep.") at 117:20-118:16.  Thus, the fact that the station could theoretically be moved a far enough distance away from the press brake so as to prevent an operator's hand from reaching the point of operation during foot pedal actuation is not sufficient to conclude that use of the control station at a safe distance is a normal circumstance of use. Additionally, the fact that Mustafa's accident occurred as

---

[26] For example, Anthony Eliou testified that Eliou did not have a guideline regarding how far the control station needed to be from the point of operation.  A. Eliou Dep. at 66:19-22.

Mustafa was standing behind the control station and reaching from behind the control station into the point of operation suggests that it was not normal in the industry to use the control station far enough away from the point of operation to protect an operator's hands.[27]  The actual circumstances of Mustafa's injury, combined with Growney's testimony on industry practice, raise a triable issue of fact whether a normal circumstance of use exist where utilizing the press brake in foot mode without a light curtain was unreasonably dangerous.

Additionally, Halkin's argument that an operator could use hand mode misses the mark.  Plaintiff's contention is that there is a triable issue of fact whether lack of a light curtain when the machine is operated in foot mode makes the machine unreasonably dangerous in all circumstances.  The palm buttons are inoperative and the operator's hands are free when an operator uses the foot pedal; thus, the use of the press brake in hand mode cannot speak to whether operating the press brake in

---

[27] In fact, in <u>Scarangella</u> itself, the court reasoned that there would have been a triable issue of fact if plaintiff had offered evidence that the bus was put in reverse in a place other than the bus parking yard.  <u>Scarangella</u>, 93 N.Y.2d at 662, n. 1, 695 N.Y.S.2d at 524 n. 1,  717 N.E.2d at 683 n. 1 ("had this accident occurred out of the bus parking yard, or had plaintiff ... submitted evidence of some incidence of buses backing up outside the yard, at least a triable issue might have been created as to whether there was an actual separate and distinct normal use of the buses without back-up alarms which was reasonably safe.").  <u>Accord</u> <u>Donald v. Shinn Fu Co.</u>, No. 99-CV-6397, 2002 WL 32068351, at *12 (E.D.N.Y. Sept. 4, 2002).

foot mode is reasonably safe when no light curtain is used. Furthermore, Halkin has not demonstrated that using hand mode was clearly not a "normal" way to operate the machine in the industry.[28]

Moreover, Halkin's argument that the stop button on the control station would have shut off the machine, negating the need for the point of operation guards, does not address inadvertent press brake activations, which Mustafa argues is a normal and foreseeable misuse of the machine. Growney Report at ¶ ¶ 7.43-7.44.

Finally, Halkin's contention that the operator of the press brake was never required to have any part of his body "anywhere near the point of operation" when operating the press brake in foot mode likewise fails to address inadvertent press brake activations or speak to the normal circumstances of use of the machine.[29]

---

[28] For example, at Eliou, the sole operator of the press brake "never operated the press brake using the 'hand mode'" and thought that "hand buttons were unnecessary." Def.'s Mem. in Supp. at 5-6.

[29] At Eliou, for example, it was standard operating procedure for press brake operators to grasp the work pieces during bending in order to stabilize them when finished. Growney Report ¶ 7.40; Bezler Dep. at 28:4-30:22. Additionally, Bezler testified that when he was teaching Mustafa how to use the press brake, his demonstration included placing his hands on the metal piece as it was being bent. Bezler Dep. at 68:2-14, 71:2-8, 72:6-15.

Mustafa offers additional evidence in support of his argument that a triable issue of fact exists on the second factor: Growney testified that operating the press brake in foot mode without an accompanying safeguard, such as a light curtain, is dangerous and that the risk of injuries to users of press brakes with an unguarded point of operation has been known and reported in the industry for years, Growney Report at ¶ 7.46; accidents similar to Mustafa's have occurred with other Halkin press brakes, Albrecht Dep. at 128:15-129:8; OSHA, ANSI and New York state regulations mandate use of guards at the point of operation of press brake machines (regardless of who is responsible for ensuring they are in place) in an attempt to remedy the dangers associated with foot actuated press brakes.[30]

---

[30] In its reply brief, Halkin cites to an unpublished Second Circuit opinion, Euclides Campos v. Crown Equipment Corp., 2002 U.S. App. LEXIS 13243 (2d Cir. 2002), to counter Mustafa's argument that the press brake cannot be operated safely without a barrier guard. Foremost, as this is an unpublished case, it cannot be relied on as precedential authority. Furthermore, nothing in the district court opinion, Campos, 2001 U.S. Dist. LEXIS 24575, that was upheld by the Second Circuit's unpublished opinion compels the conclusion that Halkin is not liable for failure to include the light curtain as standard equipment as a matter of law under Scarangella. The plaintiff in Campos alleged that the forklift that injured him was defective because it was not equipped with an optional back-up alarm. The court held, like other courts before on virtually identical facts, that there was nothing unreasonably dangerous about the use of a forklift in a warehouse without a backup alarm. Here, we are looking at a press brake operable by foot pedal without corresponding safety guards. The machine and fact pattern in Campos is not sufficiently analogous to this case to find that Halkin is not liable under Scarangella. 1 N.Y. Products Liability 2d §21:18 (stating that court's decisions under Scarangella "seem to be a

Ultimately, the <u>Scarangella</u> court emphasized that the manufacturer remains in the best position to determine what safety devices should be employed, and, thus, cannot sell the product without a safety device, when the manufacturer knows the dangers inherent in a product and where the dangers do not vary depending on job site. <u>Scarangella</u>, 93 N.Y.2d at 660-61, 695 N.Y.S.2d at 523-24, 717 N.E.2d at 682-83 (citing to <u>Rosado v. Proctor & Schwartz Inc.</u>, 66 N.Y.2d 21, 26, 484 N.E.2d 1354, 1358, 494 N.Y.S.2d 851, 855 (1985)). Here, Halkin offers no testimony that the danger of operating the press brake in foot mode without a guard at the point of operation changes depending on job site. Instead, Halkin offers evidence that the types of bending formations each employer uses varies across job site, and that, depending on the bending formation at hand, the effectiveness of the light curtain as a safety device varies. However, the fact that certain operating conditions may decrease the effectiveness of a light curtain as a safety mechanism does not alter the fact there remains a triable issue of fact whether the press brake is unreasonably dangerous in all normal circumstances without a light curtain under <u>Scarangella</u>.[31] Drawing all factual

---

function of the particular machine and fact pattern involved therein.")

[31] Only after evidence is presented at trial will it be possible to determine whether the light curtain (or other advocated alternative design) would have prevented Mustafa's accident without impeding the effectiveness of the machine.

inferences in favor of Mustafa, these factors may show that the press brake is unreasonably dangerous without a light curtain or other guard.  Growney Report at ¶ ¶ 7.45, 7.47, 7.49;  Mem. in Opp. at 21.  In other words, a reasonable juror could reach the conclusion that there are no normal circumstances of use in which the press brake without the light curtain is not unreasonably dangerous.  Therefore, the issue must be put before a jury.  See, e.g., Donald, 2002 WL 32068351, at *12 (considering expert testimony that the user is put at risk when using fork lift jack to have raised a triable issue of fact as to the second Scarangella factor and denying motion for summary judgment on the design defect claim).

As there is a triable issue of fact as to the second Scarangella factor, Halkin has failed to establish its entitlement to summary judgment.  Thus, Eliou's failure to purchase the optional light curtain does not, as a matter of law, negate Mustafa's claim that the press brake was defectively designed.

---

Jiminez, 736 F.2d at 54 (recognizing in design defect case that loss of utility caused by manufacturer-installed safety guards is only one factor that the jury may consider as it balances the product's risks against its utility and cost).

**Failure to Warn**

Halkin next argues that summary judgment is warranted on Mustafa's failure to warn claims because the warnings were adequate, the risk of injury was open and obvious, Mustafa was aware of the dangers posed by the point of operation and the warnings were not the proximate cause of Mustafa's injuries. Def.'s Mem. in Supp. at 19-21.[32]

**a. Strict products liability and negligence claims based upon failure to warn**

A defendant may be liable under a negligence or strict products liability theory by failing to adequately warn of a potentially harmful aspect of the product. There is no difference between the prima facie elements of a failure to warn claim sounding in negligence and one sounding in strict products liability. <u>Martin v. Hacker</u>, 83 N.Y.2d 1, 8 n.1, 607 N.Y.S.2d 598, 601 n.1, 628 N.E.2d 1308, 1311 n.1, (1993)("Where liability is predicated on a failure to warn, New York views negligence and strict liability claims as equivalent."). <u>See also</u>, <u>Henry v. Rehab Plus Inc.</u>, 404 F. Supp. 2d 435, 443 (S.D.N.Y. 2005). In

---

[32] Mustafa raises no arguments as to the inadequacy of the pictorial warnings and admits he did not pay attention to the pictorial warnings. Second Mustafa Dep. at 197:16-20. Thus, the focus of the failure to warn section will be on the written warnings only.

either instance, a failure to warn claimant must show: 1) the manufacturer had a duty to warn; 2) the duty to warn was breached; and 3) the failure to warn was a substantial or proximate cause of the harm.  See, e.g., Clarke, 219 F. Supp. 2d at 329; Colon ex rel. Molina, 199 F. Supp. 2d at 84.

**b. Duty to warn and proximate cause**

Mustafa argues correctly that whether warnings were adequate to deter potential misuse and whether the alleged failure to warn was a substantial or proximate cause of the injury is ordinarily a question for the jury.  See Howard v. Poseidon Pools, 72 N.Y.2d 972, 974, 534 N.Y.S.2d 360, 361 (1988); Johnson v. Johnson Chem. Co., 183 A.D.2d 64, 69, 588 N.Y.S.2d 607, 609 (2d Dep't 1992). See also 1 Weinberger, NY Products Liability § 18:17. Nevertheless, a court may dismiss a failure to warn claim as a matter of law if: (1) the defendant had no duty to warn because the hazard was patently dangerous or posed an open and obvious risk, see Liriano v. Hobart Corp, 92 N.Y.2d 232, 241, 700 N.E.2d 303, 308, 677 N.Y.S.2d 764, 769 (1998); Burke v. Spartanics, Ltd., 252 F.3d 131, 137 (2d Cir. 2001); or (2) plaintiff cannot prove that the absence of warning proximately caused his injury, Liriano, 92 N.Y.2d at 241, 700 N.E.2d at 308, 677 N.Y.S.2d at 769 (no causation where "the injured party was fully aware of the hazard through general knowledge, observation or common sense");

Banks v. Makita, U.S.A., Inc., 226 A.D.2d 659, 660, 641 N.Y.S.2d 875, 877 (2d Dep't 1996) (no causation where plaintiff failed to come forward with evidence that if adequate warnings had been provided, the product would not have been misused); Burke, 252 F.3d at 137 (no causation where plaintiff was actually aware of the danger of placing his hand in the cutting plane of a metal shearing machine).

Here, Halkin argues that it is not liable because Mustafa was fully aware of the danger. Halkin points out that Mustafa was an experienced machinist who acknowledged several times in his deposition that it was dangerous to put his hand near the point of operation without first turning off the power. Def.'s Mem. in Supp. at 21; Reply Mem. at 8. Mustafa counters that this awareness is not sufficient to grant summary judgment because even though he was aware of the danger of placing his hands in the point of operation, there is no evidence that he was aware that he could be hurt by operating the press brake in foot mode without an accompanying safeguard. Mem. in Opp. at 23. Mustafa argues that a jury must determine the extent, if any, of Mustafa's knowledge of the hazards associated with foot-pedal operation of an unguarded press brake. Id. at 24. Mustafa further contends that his reaction was instinctive, not a calculated decision to engage in risky behavior. Id. at 23.

Halkin also argues, more persuasively, that the warnings were not the proximate cause of the accident because 1) Mustafa admits he acted instinctively; and 2) Mustafa could not read English. Def.'s Mem. in Supp. at 20. Thus, Halkin asserts, no additional warning would have influenced Mustafa's conduct and prevented the accident. Reply Mem. at 2, 8. Mustafa responds only to the instinctive argument, contending that if the warnings alerted him against operating the press brake in foot mode without safeguards, Mustafa never would operated the machine. Mem. in Opp. at 23. Mustafa makes no argument regarding his inability to read the English warnings at the time of the accident.

Putting aside for the moment the question of whether the risks inherent in placing one's hands in a press brake accidentally activated by a foot pedal are sufficiently obvious and well-known to require no warning as to absent point of operation guards as a matter of law, it is clear that Mustafa cannot prove that the alleged inadequacy of the warnings was the proximate cause of the accident. The plaintiff in a products liability action premised on inadequate warning must prove causation, specifically, that failure to adequately warn of the dangers was a proximate cause of his injuries. <u>See, e.g.</u>, <u>Sosna v. Amer. Home Prods.</u>, 298 A.D.2d 158, 158, 748 N.Y.S.2d 548, 549 (1st Dep't 2002). To constitute proximate cause, an inadequate

warning must be a substantial cause of the events leading to the injury.  See, e.g., Belling v. Haugh's Pools, Ltd., 126 A.D.2d 958, 959m 511 N.Y.S.2d 732, 733 (4th Dep't 1987).  An act cannot be the "substantial cause" if the injury would have occurred regardless of the content of defendant's warning.  Figueroa v. Boston Scientific Corp., 254 F. Supp. 2d 361, 370 (S.D.N.Y. 2003).  Here, it is undisputed that, at the time of the incident, Mustafa did not read or understand English.  Second Mustafa Dep. at 202:18-203:3; Growney Report ¶ 7.57; Eaton Report at 4, 14. The written warnings were in English.  Even if the warning read exactly as Mustafa argues, specifically, "do not operate the press brake by use of foot pedal activation in the absence of a guard at the point of operation," Mustafa would still not have read or understood the warning, his behavior would have remained unchanged and the accident would have occurred.  Gonzalez by Gonzalez v. Morflo Industrs., Inc., 931 F. Supp. 159, 168 (E.D.N.Y. 1996) ("where a warning would not have increased the particular injured user's awareness of the danger, failing to warn cannot be said to have been the proximate cause of the accident") (citing Kerr v. Koemm, 557 F. Supp. 283, 286 (S.D.N.Y. 1983).

It is true that there is some authority for the proposition that even a plaintiff who concededly failed to read product warnings may still prove causation if he can demonstrate either

that he would have read the warning had it been more prominent or conspicuously placed, <u>Johnson</u>, 183 A.D.2d 64 at 70-72, 588 N.Y.S.2d at 610-612, or that he would have been unable to understand the warning had he read it, <u>Arbaiza v. Delta Int'l Mach. Corp.</u>, No. 96-1224, 1998 WL 846773, at *7 (E.D.N.Y. Oct. 5, 1998) (finding Spanish-speaking plaintiff who admittedly did not read warnings raised an issue of fact whether the warning was inadequate because, among other things, it was in English only); <u>Hedstrom Corp.</u>, 76 F. Supp. 2d at 443 (finding role content and clarity of the warnings played in plaintiff's failure to read them to be issue of fact). However, the plaintiffs in these cases raised issues of fact as to whether fault in the prominence, placement, clarity and/or content of the warning prevented them from reading it and, therefore, was causally related to their injury. Here, Mustafa is not claiming that the very nature of the alleged inadequacy of the warning caused his failure to read it; Mustafa has not asserted that he would have read the warning it if had been in Albanian, been in a larger font or located in a different place. The fact that the warnings were in English, a language Mustafa was unable to read or understand at the time of the accident, severs the causal connection between the alleged inadequacy of the warning and the accident. As the plaintiff, Mustafa has the burden of proving the absence of an adequate warning proximately caused his injury.

See Fed. R. Civ. P. Rule 56(c); Banks, 226 A.D.2d at 660, 641 N.Y.S.2d at 877. As Mustafa does not allege that the warning was inadequate because it was only in English, he did not raise a question of fact to go to a jury. See, e.g., Anderson v. Bungee Int'l Mfr. Corp., 44 F. Supp. 2d 534, 539-40 (S.D.N.Y. 1999) (granting summary judgment on failure to warn claim because plaintiff failed to sustain his burden of proof that he would have read the warning if it were in a different place).

The only remaining way Mustafa could prove the requisite casual link in light of his inability to read the warning is under a theory of causation whereby third party may have conveyed the warning to him. At least three New York courts have allowed failure to warn claims to go to a jury under the theory that "'if a proper warning had been given, it could have come to the attention of officials of plaintiff's employer or perhaps even fellow workers, who could have informed plaintiff of what he had not personally read.'" Power v. Crown Controls Corp., 149 Misc.2d 967, 970, 568 N.Y.S.2d 674 (N.Y.Sup. 1990) (holding worker who had not read warnings which were placed on the forklift could recover for manufacturer's failure to provide adequate warnings if he could show that adequate warnings would have come to the attention of fellow workers or his employer and that they would have informed him of those warnings) (rev'd on other grounds, 189 A.D.2d 310, 596 N.Y.S.2d 38 (1993)). See also

<u>Derienzo v. Trek Bicycle Corp.</u>, 376 F. Supp. 2d 537, 570
(S.D.N.Y. 2005) (noting that "the 'realities of society'-i.e.,
the realities of the mountain biking community-might have
resulted in Plaintiff's friends advising him not to use a Y5
model for jumping, even if Plaintiff had not read the warning
himself.");  <u>Hedstrom</u>, 76 F. Supp. 2d at 445 n. 24 (noting that a
witness to the accident, who testified that she was concerned
about how plaintiff was using the trampoline but did not say so
at the time, might have spoken up had an adequate written warning
accompanied the product).  However, given Mustafa's specific fact
situation, it is clear that neither Mustafa's employers or co-
workers would have been able to convey the advocated warning to
him, either verbally or non-verbally.  On the two to three days
leading up to and including the accident, Mustafa was not
conversant in English.  No one at Eliou spoke Albanian.  The
translator who was present during Mustafa's interview was not
present after the interview.  Thus, the language barrier
prevented verbal communication.  Furthermore, the warning could
not have been conveyed to Mustafa non-verbally because Eliou did
not have any foot pedal safeguards available on the premises to
show him to use.  Eaton Report at 16.  Thus, because there is no
evidence that anyone at Eliou could have actually have been able
to convey the warning to him, this third-party conveyance theory
cannot help Mustafa make out proximate causation.

As Halkin's alleged failure to warn was not the proximate cause of the injury in this case, Halkin's motion for summary judgment is granted on the failure to warn claims based in strict products liability and negligence.

## Conclusion

The testimony of plaintiff's expert, Growney, is admissible. Defendant's motion for summary judgment is denied on plaintiff's defective design claims and granted on plaintiff's failure to warn claims.

Dated:     Brooklyn, New York
           March 29, 2007

SO ORDERED:

_____/s/_____

David G. Trager
United States District Judge